02-4611-ag, 02-4629-ag, 03-40837-ag
Lin et. al. v. U.S. Dept. of Justice

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: March 7, 2007                                        Decided: July 16, 2007)

Docket Nos. 02-4611-ag, 02-4629-ag, 03-40837-ag

_____

SHI LIANG LIN,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF JUSTICE; ATTORNEY GENERAL GONZALES,

*Respondents;*

_____

ZHEN HUA DONG,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF JUSTICE; ATTORNEY GENERAL GONZALES

*Respondents;*

_____

XIAN ZOU,

*Petitioner,*

v.

ATTORNEY GENERAL GONZALES,

*Respondent.*

_____

Before: JACOBS, *Chief Judge,* CALABRESI, CABRANES, STRAUB, POOLER, SACK, SOTOMAYOR,

KATZMANN, PARKER, RAGGI, WESLEY, and HALL, *Circuit Judges*.

Petitions for review of orders of the Board of Immigration Appeals denying applications for asylum, withholding of removal, and relief under the Convention Against Torture. The petition for review of Zhen Hua Dong is DENIED. Xian Zou's and Shi Liang Lin's petitions are DISMISSED for lack of jurisdiction.

Judge PARKER delivered the opinion of the Court, in which JACOBS, *C.J.*, and CABRANES, SACK, RAGGI, WESLEY, and HALL, *JJ.*, joined.

Judge KATZMANN filed a concurring opinion, in which STRAUB, POOLER, and SOTOMAYOR, *JJ.*, joined.

Judge SOTOMAYOR filed a concurring opinion, in which POOLER, *J.*, joined.

Judge CALABRESI filed an opinion concurring in part and dissenting in part.

BRUNO JOSEPH BEMBI, Hempstead, NY, *for Petitioners Shi Liang Lin and Zhen Hua Dong.*

ALEKSANDER MILCH, Christophe & Associates, P.C., New York, NY, *for Petitioner Xian Zou.*

KATHY S. MARKS, Assistant United States Attorney, (Sara L. Shudofsky, Assistant United States Attorney, *of counsel*) for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, *for Respondents the United States Department of Justice and Attorney General Gonzales.*

BARRINGTON D. PARKER, *Circuit Judge*:

In 1997 the Board of Immigration Appeals ("BIA") held in *Matter of C-Y-Z-,* 21 I. & N. Dec. 915 (B.I.A. 1997) (en banc) that an individual whose spouse has been forced to abort a pregnancy, undergone involuntary sterilization, or been persecuted under a coercive population

control program could automatically qualify for asylum as a "refugee" under § 601(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") (amending 8 U.S.C. § 1101(a)(42), Immigration and Nationality Act ("INA") § 101(a)(42)). *See In re S-L-L-*, 24 I. & N. Dec. 1, 3 (B.I.A. 2006) (en banc) ("In *Matter of C-Y-Z-*, . . . we held that a husband whose wife was forcibly sterilized could establish past persecution under this amendment to section 101(a)(42) of the [INA]."). This appeal considers whether the BIA's interpretation of the statute was correct. We conclude it was not.

Petitioners Shi Liang Lin, Zhen Hua Dong, and Xian Zou are citizens of the People's Republic of China and unmarried partners of individuals allegedly victimized by China's coercive family planning policies. Each seeks review of an order of the BIA summarily affirming the denial of an application for asylum based, in part, on the BIA's holding in *C-Y-Z-*.[1] We remanded these petitions to the BIA to afford it the opportunity to explain its rationale in *C-Y-Z-* for reading § 601(a) to say that the spouses of those directly victimized by coercive family planning policies are *per se* eligible for asylum as if they were directly victimized themselves and also to clarify the status of boyfriends and fiancés under that statute. *See Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 187 (2d Cir. 2005). We retained jurisdiction. *Id.*

On remand, the BIA reaffirmed its holding in *C-Y-Z-* that spouses are entitled to automatic eligibility under § 601(a) but limited this *per se* eligibility to legally married applicants. *S-L-L-*, 24 I. & N. Dec. 1. Eschewing a text-based analysis, the BIA elected to

---

[1] *See In re Shi Liang Lin*, No. A70 895 638 (B.I.A. Sept. 29, 2002), *aff'g* No. A70 895 638 (Immig. Ct. N.Y. City May 9, 2000); *In re Zhen Hua Dong*, No. A 7 293 661 (B.I.A. Sept. 25, 2002), *aff'g* No. A77 293 661 (Immig. Ct. N.Y. City Oct. 12, 2000); *In re Zou*, No. A77 322 595 (B.I.A. Aug. 27, 2002), *aff'g* No. A77 322 595 (Immig. Ct. N.Y. City Apr. 4, 2002).

3

interpret the forced abortion and sterilization clause of the section "in light of the overall purpose of the amendment" to include both parties to a marriage. *Id.* at 8. The Board reaffirmed the dismissal of the appeals of petitioners Lin*, id.*, and Dong, *In re Zhen Hua Dong*, No. A77 293 661 (B.I.A. Nov. 27, 2006), and remanded Zou's petition for a determination of whether he qualified for asylum based on the "other resistance to a coercive population control program" clause in § 601(a), *In re Xian Zou,* No. A73 178 541 (B.I.A. Nov. 21, 2006).

Following the BIA's decision, we ordered rehearing *en banc* to consider two issues: First, whether § 601(a)'s provisions are ambiguous, so that the BIA's construction of them warrants *Chevron* deference; and second, whether the BIA reasonably construed § 601(a) to extend automatic asylum eligibility to a petitioner whose legally married spouse was subjected to an involuntary abortion or sterilization but not to a domestic partner or fiancé whose claim is derivative unless the petitioner engaged in "other resistance" to a coercive population control policy. *Lin v. U.S. Dep't of Justice*, Nos. 02-4611, 02-4629, 03-40837 (2d Cir. Nov. 13, 2006) (order) ("*En banc order*"). *See S-L-L-*, 24 I. & N. Dec. 1; *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984).

We now conclude that the BIA erred in its interpretation of 8 U.S.C. § 1101(a)(42) by failing to acknowledge language in § 601(a), viewed in the context of the statutory scheme governing entitlement to asylum, that is unambiguous and that does not extend automatic refugee status to spouses or unmarried partners of individuals § 601(a) expressly protects. Accordingly, the petition of Zhen Hua Dong is denied. The petition of Shi Liang Lin is dismissed as moot.[2]

---

[2] Subsequent to oral arguments, we learned that Lin has had no contact with his attorneys since "early 2004," and that his attorney believes that he has either returned to China or is deceased. (Aff. of Yee Ling Poon, ¶¶ 3-5). Accordingly, Lin's case is moot. *See* 8 C.F.R. §

The petition of Xian Zou is dismissed for lack of jurisdiction.[3] We recognize that this decision creates a split among the circuits.[4]

## I. BACKGROUND

Congress has given the Attorney General the discretionary authority to grant asylum to an alien who qualifies as a "refugee" because he or she "is unable or unwilling to avail himself

---

1208.8.

[3] We no longer have jurisdiction over Zou's petition because the BIA has remanded the case to the immigration court for further findings. *See In re Xian Zou*, No. A77 322 295 (B.I.A. Nov. 21, 2006).

[4] A number of our sister circuits have deferred to the BIA's interpretation of § 601(a). *See, e.g., Zhang v. Gonzales,* 434 F.3d 993, 1001 (7th Cir. 2006)*; Huang v. Ashcroft*, 113 Fed. App'x 695, 700 (6th Cir. 2004) (unpublished opinion); *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003); *Li v. Ashcroft*, 82 Fed. App'x 357, 358 (5th Cir. 2003) (unpublished per curiam opinion). While the Third Circuit had questioned the BIA's reading of the plain language of the amendment, stating that "[i]t takes some effort to reconcile [the BIA's] interpretation with the language of the 1996 amendment, since the phrase 'a person who has been forced to abort a pregnancy or to undergo involuntary sterilization' is most naturally read as referring only to a person who has personally undergone one of those procedures**,**" *Chen v. Ashcroft*, 381 F.3d 221, 226 (3d Cir. 2004) (Alito, *J.*)**,** a divided panel of the Third Circuit recently validated the BIA's interpretation of § 601(a) over a vigorous dissent. *See Sun Wen Chen v. U.S. Att'y Gen.*, – F.3d –, 2007 WL 1760658, at *4-*6 (3d Cir. June 20, 2007).
The circuits are already split over whether § 601(a) provides protection for individuals who marry in traditional ceremonies not recognized by their government and later seek asylum based on the forced abortion or sterilization of their "common law spouses." The Seventh and Ninth Circuits have held that the statute covers spouses from traditional marriage ceremonies*, see Zhang*, 434 F.3d at 999; *Zhu v. Gonzales*, 465 F.3d 316, 321 (7th Cir. 2006); *Ma v. Ashcroft*, 361 F.3d 553, 559-61 (9th Cir. 2004). In contrast, the Third Circuit, in *Chen*, *supra*, held that the amendment does not cover unmarried partners, even when they have been prevented from marrying by their government's family planning policy. 381 F.3d at 232-34; *see also Chen v. Gonzales*, 418 F.3d 110, 111 (1st Cir. 2005) (acknowledging circuit split on the issue). While they have not reached the issue of traditional marriage ceremonies, the Fifth and Eleventh Circuits have declined to extend IIRIRA § 601 to cover boyfriends of individuals who have been subjected to a forced abortion or sterilization. *See Zhang v. Ashcroft,* 395 F.3d 531, 532 (5th Cir. 2004); *Wang v. U.S. Att'y Gen.*, 152 Fed. App'x 761, 767 (11th Cir. 2005) (unpublished opinion).

or herself of the protection of [his or her native country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1).

In 1996, Congress passed IIRIRA § 601(a), which amended 8 U.S.C. § 1101(a)(42) by broadening its definition of "refugee," adding the following language:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42).

The next year, the BIA held that "past persecution of one spouse can be established by coerced abortion or sterilization of the other spouse," so that spouses of individuals directly victimized by coercive family planning policies are *per se* eligible for asylum pursuant to § 1101(a)(42). *See Matter of C-Y-Z-,* 21 I. & N. Dec 915, 917-18 (B.I.A. 1997) (en banc). The BIA gave no reasons for reading the statute to compel this result.

Petitioner Lin entered the United States in January 1991 and filed an application for asylum and withholding of removal in June 1993. According to Lin's application, he had sought the required governmental permission to marry his girlfriend and have children with her, but she was too young under Chinese law. After his girlfriend became pregnant and was forced to have

6

an abortion, Lin left China. His girlfriend remained in China because she was too weak to travel. Following a hearing, the IJ found Lin credible, but concluded that he did not qualify for asylum based on his girlfriend's forced abortion and denied the petition. The BIA affirmed without opinion. *See In re Shi Liang Lin*, No. A70 895 638 (B.I.A. Sept. 29, 2002), *aff'g* No. A70 895 638 (Immig. Ct. N.Y. City May 9, 2000).

Petitioner Dong attempted to enter the United States in October 1999, and was detained by INS officials. When the INS commenced removal proceedings, Dong requested asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). His asylum petition was based on a claim that his fiancée (who continued to reside in China) had been forced to undergo two abortions and that he would be jailed and fined for having left China illegally were he to be deported. The IJ denied Dong's petition, finding that, although he was credible, he did not qualify for refugee status as a fiancé of a woman who had undergone forced abortions, and had not established other grounds for relief. The BIA affirmed the IJ's decision. *See In re Zhen Hua Dong*, No. A77 293 661 (B.I.A. Sept. 25, 2002), *aff'g* No. A77 293 661 (Immig. Ct. N.Y. City Oct. 12, 2000).

Petitioner Zou was taken into custody by the INS when he attempted to enter the United States in September 2000. After removal proceedings commenced, Zou filed for asylum. Under Chinese law, Zou and his girlfriend had been too young to marry. He claimed that she had been forced to have an abortion and he had been threatened with arrest after protesting to family planning officials. An IJ denied the application. The IJ found Zou's testimony concerning his threatened arrest incredible, doubting that Zou would be able to evade the Chinese authorities and travel to the United States with an outstanding warrant of arrest from the Chinese

7

government.  Left only with Zou's claim that his girlfriend had undergone a forced abortion, the IJ held that Zou did not qualify for relief under § 1101(a)(42) on that basis.  Zou appealed to the BIA, which affirmed the decision of the IJ.  *See In re Zou*, No. A77 322 595 (B.I.A. Aug. 27, 2002), *aff'g* No. A77 322 595 (Immig. Ct. N.Y. City Apr. 4, 2002).  The three petitioners sought review here and the cases were heard in tandem.

Three different interpretations of the application of "refugee" status to the facts in these cases have been proposed by the parties throughout the litigation.  When we heard the petitions in tandem, the Department of Justice argued that § 601(a) of IIRIRA should be understood to confer *per se* refugee status on spouses of individuals who had undergone forced abortions or involuntary sterilizations, but not to boyfriends or fiancés, who were covered, if at all, under the "other resistance" language of the amendment.  Second, the petitioners argued, both before this Court and before the BIA, that the distinction between spouses and unmarried partners was arbitrary and that the statute should be interpreted to extend *per se* refugee status to the committed partners of individuals who have been forced to undergo an abortion or involuntarily sterilization.

The third, a text-based interpretation, was put forth before the BIA by the Department of Homeland Security ("DHS"), which is "charged with the administration and enforcement of . . . laws relating to the immigration and naturalization of aliens," 8 U.S.C § 1103(a)(1).  In its brief to the BIA, the DHS insisted that no support existed in the statute for the BIA's automatic extension of  § 601(a) to spouses.  Specifically, the DHS asserted that the BIA's interpretation was "at odds with the most natural reading of the statute and with established principles of asylum law."  Brief of DHS on Remand at 5, *In re S-L-L-*, 24 I. & N. Dec. 1 (B.I.A. 2006) (en

banc) (No. A 70 895 638) ("*DHS brief*"). Carefully considering the text of § 601(a), the DHS concluded that a rule conferring *per se* refugee status on spouses of individuals persecuted under coercive family planning policies contradicted the unambiguous language of the amendment. Further, the DHS stated that such a rule was at odds with the legislative history of the amendment, as well as "a fundamental precept of U.S. refugee law . . . that, to qualify for protection, an applicant must demonstrate that he will be targeted for his own protected belief or characteristic." *DHS brief* at 8-9, 11. The DHS understood that the statute required a "case-by-case" application to individuals who have not themselves been victims of a forced abortion or involuntary sterilization. Under this approach, spouses, boyfriends, and fiancés would have to demonstrate their qualification for refugee status under the "for other resistance to a coercive population control program" provision of § 601(a).

On remand, in *S-L-L-*, 24 I. & N. Dec 1, the BIA affirmed its earlier decision in *C-Y-Z* that under § 601(a) an applicant whose spouse was forced to undergo an abortion or sterilization procedure is automatically entitled to asylum, while limiting its interpretation to individuals who were opposed to their legal spouse's abortion or sterilization. *Id.* at 4. The BIA reasoned that § 601(a) provided "no clear or obvious answer to the scope of the protections . . . to partners of persons forced to submit to an abortion or sterilization." *Id.* As a result of this perceived ambiguity, the majority chose to ground its interpretation "in the context of the history and purposes of the Act as a whole," finding that

> absent evidence that the spouse did not oppose an abortion or sterilization procedure, we interpret the forced abortion and sterilization clause of section 101(a)(42) of the Act, in light of the overall purpose of the amendment, to include both parties to a marriage.

*Id.* at 8. While the decision rested on "the forced abortion and sterilization clause of section 101(a)(42)," the Board noted that it was applying "general principles regarding nexus and level of harm." *Id*. at 5.

The majority based its conclusion on a number of policy-based factors, including the positions taken by the litigants and the fact that *C-Y-Z-*, as a ten-year-old decision, constituted long-standing precedent. The majority was also influenced by the shared responsibility of married couples regarding family planning decisions under Chinese law and the "profound impact" that a forced abortion or sterilization has on both parties to a marriage. *Id.* at 6-8.

The majority stopped short of extending a *per se* presumption to boyfriends, fiancés, and other unmarried partners. It concluded that they were not comparable to husbands because "the sanctity of marriage and the long term commitment reflected by marriage place the husband in a distinctly different position from that of an unmarried father." *Id.* at 9. The BIA dismissed the appeals of Lin, *id.*, and Dong, *In re Zhen Hua Dong*, No. A77 293 661 (B.I.A. Nov. 27, 2006), and remanded Zou's case to the immigration court "for further evidence on the issues of resistance and harm" based on the "other resistance" clause of § 1101(a)(42), *In re Xian Zou, No. A73 178 541 (B.I.A. Nov. 21, 2006).

Board Member Pauley concurred. While deferring to the BIA's prior decision in *C-Y-Z* as long-standing and widely accepted precedent, he conceded that:

> [w]ere we writing on a clean slate, I would adopt the lately arrived at position of the Department of Homeland Security . . . that whether or not the spouse of a forcibly sterilized or aborted individual can be found to have been persecuted depends on a case-by-case assessment of whether that spouse was persecuted on account of "other resistance" to a coercive population control system, because the language of the Act does not support extending refugee status to any person other than the one sterilized or aborted, aside from the "other resistance" ground.

*Id.* at 13 (Pauley, *B.M.,* concurring).

Board Member Filppu, joined by Board Member Cole, concurred in the result but dissented from the majority's reaffirmation of *C-Y-Z.* They reasoned that the language of the statute was unambiguous in "focus[ing] on 'a person' who has been forced to abort a pregnancy, not on a 'couple,' let alone a married couple . . . ." *Id.* at 16 (Filppu, *B.M.,* concurring and dissenting). Understanding that "statutory interpretation must begin with reference to the language and structure of the statute," *id.* at 15, and "Congress expresses its intent through the language it chooses," *id.* at 19 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987)), the dissenters concluded that an individual who has not been subjected to a forcible abortion or sterilization procedure can qualify for refugee status in relation to a coercive family planning policy only if he proves that he was persecuted or has a well-founded fear of future persecution "for other resistance to a coercive population control program." *Id.*[5]

Following the BIA's decision, we ordered an *en banc* rehearing to determine whether § 601(a) is ambiguous, whether the BIA's interpretation of "refugee" should be accorded *Chevron* deference*,* and "[w]hether the BIA reasonably construed IIRIRA § 601's definition of "refugee" to: (a) include a petitioner whose legally married spouse was subjected to an involuntary abortion or sterilization . . . ; and (b) not include a petitioner whose claim is derivatively based on any other relationship with a person who was subjected to such a procedure, unless the petitioner has engaged in 'other resistance' to a coercive population control program . . . ." *See*

---

[5] While here, as throughout the opinion, we refer to a male petitioner with a wife or girlfriend who has been forced to undergo an abortion or sterilization, our reasoning applies with equal force to the perhaps more uncommon situation in which a female petitioner's male spouse or boyfriend has been forced to undergo sterilization.

*En banc order.* We now conclude that the BIA's interpretation of the statute is not correct.

## II. DISCUSSION

When reviewing the BIA's interpretation of statutes that it administers, we apply the *Chevron* principles. We first ask if Congress has spoken. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842-43; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 447-48 (1987). Only if the statute is silent or ambiguous do we turn to the second inquiry – whether the BIA's interpretation constitutes "a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

While the petitioners in this case are unmarried partners, and not spouses, of individuals who have been subjected to forced abortions, we review the BIA's interpretation of § 601, as articulated in its decision below, to extend a *per se* presumption of persecution to spouses, but not to non-married partners, of individuals who have been involuntarily subjected to an abortion or sterilization.[6] It is the existence of this spousal policy that the petitioners argue is an arbitrary and capricious interpretation of the statute. If the BIA's policy is at odds with the plain language of the statute, it makes little sense to consider only whether it can reasonably be limited to couples who are formally married.

---

[6] We announced our intention to reach this question in our order that this case be reheard *en banc*. In that order we instructed the parties to address the BIA's interpretation of § 601 as it related to both spouses and non-married partners of individuals subjected to an involuntary abortion or sterilization. All members of this *en banc* panel joined the order, including those who now express confusion as to why we reach the question. We are particularly perplexed by the position taken by our colleagues Judge Katzmann and Judge Sotomayor, who contend we are overreaching by considering whether the BIA's *per se* rule survives review under *Chevron* step one, but who then proceed to assess, and declare valid, the same rule under *Chevron* step two. Op. of Judge Katzmann at 16, Op. of Judge Sotomayor at 1 & n.1.

Accordingly, we start our *Chevron* analysis of § 601(a) by asking whether Congress has spoken directly to the question of whether an individual can establish past persecution based solely on his spouse or partner's forced abortion or sterilization. 467 U.S. at 842-43. In *S-L-L-*, the BIA, without elaboration or explanation, observed that "[t]here is no clear or obvious answer to the scope of the protections afforded by the amendment to partners of persons forced to submit to an abortion or sterilization." 24 I. & N. Dec. at 4. We disagree. We conclude that Congress has spoken to this issue and that it has done so unambiguously.

In the past, this Court, when following the BIA's holding in *C-Y-Z-*, has deferred to the BIA's interpretation without performing a threshold *Chevron* analysis of the ambiguity of the statute. In *Yuan v. U.S. Dep't of Justice*, for example, we stated of IIRIRA § 601 that, "[b]y its plain language, the law would seem to extend refugee status only to actual victims of persecution – for example, a woman who was 'forced to abort a pregnancy,' but not her husband." 416 F.3d 192, 196 (2d Cir. 2005). Despite this recognition of the amendment's plain language, we went on to defer to the interpretation of the BIA, stating that, "we have held that spouses of people actually subject to persecution under coercive family planning policies are *per se* eligible for asylum. . . . In doing so, however, we did not explain why. Rather, we followed the lead of the BIA." *Id.* at 196-97 (internal citation omitted); *see also Zhang v. I.N.S.*, 386 F.3d 66, 73 (2d Cir. 2004); *Qiu v. Ashcroft*, 329 F.3d 140, 149 (2d Cir. 2003). To the extent that deference implicit in these cases can be read to say that deference is due, they are overruled.

The amendment provides:

[(1)] a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or [(2)] who has been persecuted for failure or refusal to undergo such a procedure or [(3)] for other resistance to a coercive population control

program, shall be deemed to have been persecuted on account of political opinion, and [(4)] a person who has a well founded fear that he or she will be forced to undergo such a procedure or [(5)] subject to persecution for such failure, refusal, or [(6)] resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42). The language of the first clause, which refers to "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization," could not be more clear in its reference to "a person," rather than "a couple," who has been subjected to a forced abortion or involuntary sterilization. This interpretation follows two cardinal rules: first that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194 (1985); and, second, that "we begin with the understanding that Congress says in a statute what it means and means in a statute what it says there," *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000) (internal quotation marks omitted).

As the statute is written, "a person who has been forced to abort a pregnancy" unambiguously refers to a woman who has been physically subjected to a forced abortion, and "a person who has been forced . . . to undergo involuntary sterilization" means an individual who has physically undergone an involuntary medical procedure intended to result in infertility. Had Congress intended this clause to refer to a spouse or partner of someone who has been physically subjected to a forced procedure, "it could simply have said so." *Id*. at 7.

Similarly, the second clause of the amendment refers to "a person" who "has been persecuted for failure or refusal to undergo [an abortion or involuntary sterilization.]" 8 U.S.C. §

14

1101(a)(42). Like the preceding clause, this language refers to individuals who have failed or refused to *undergo* (i.e., "submit to") a procedure affecting *their own bodies*. Under the language used by Congress, having someone else, such as one's spouse, undergo a forced procedure does not suffice to qualify an individual for refugee status.

A parallel analysis governs the categories of § 601(a) relating to the establishment of a well-founded fear of future persecution. The fourth category covers "a person who has a well founded fear that he or she will be forced to undergo [an abortion or involuntary sterilization]." This category plainly excludes an individual who does not fear that *she herself* will be subjected to a forced abortion or sterilization. Not only does it refer to "a person," and indicate that that person will "undergo" the procedure his- or herself, the use of the pronouns "he" and "she" reinforces the intention of Congress to limit the application of the clause to individuals who are themselves physically forced to undergo an abortion or sterilization.

Finally, the fifth category of individuals refers to "a person who has a well founded fear that he or she will be . . . subject to persecution for such failure [or] refusal [to undergo an abortion or involuntary sterilization]." Like the language of the previous clauses, this phrase is unambiguous in its reference to "a person" who fears that "he or she" will be persecuted for his or her reaction to a threat of "undergo[ing]" an abortion or sterilization to his or her own body. This section, like the previous three categories discussed, cannot be read reasonably to cover an individual's fears arising from a coercive procedure performed on someone else.[7]

[7] No member of the *en banc* Court disputes this reading of IIRIRA § 601(a). Instead, our colleagues assert that *other* language in 8 U.S.C. § 1101(a)(42) – language predating adoption of the amendment – might (in the case of our colleague, Judge Calabresi) or does (in the case of our colleagues Judge Katzmann and Judge Sotomayor) somehow support the BIA's *per se* rule.

In *S-L-L-*, the BIA noted that it was applying "general principles regarding nexus and level of harm," 24 I. & N. Dec. at 5 – principles derived from the general refugee definition subsection of § 1101(a)(42) – to reach its holding. We believe that this approach was not correct. The general definition of a "refugee" under § 1101(a)(42) permits "any person" who experiences "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" to obtain asylum. 8 U.S.C. § 1101(a)(42). Nothing in the general definition of refugee would permit "any person" who has *not personally* experienced persecution or a well-founded fear of future persecution on a protected ground to obtain asylum, as the BIA's *per se* rule would permit. Indeed, an examination of the overall statutory scheme reassures us that, pursuant to *Chevron*, we must conclude that Congress has clearly and unambiguously spoken to the issue at hand. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) ("In determining whether Congress has specifically addressed the question at issue [under *Chevron* step one], a reviewing court should not confine itself to examining a particular statutory provision in isolation. . . . A

These assertions are incorrect, we believe, for reasons discussed *infra*.

By contrast, the Third Circuit's recent decision in *Sun Wen Chen*, which our concurring colleagues Judge Katzmann and Judge Sotomayor cite extensively even though they apparently disagree with its analysis, asserts that § 601(a) contains an ambiguity that the BIA is empowered to fill. *See Sun Wen Chen*, 2007 WL 1760658, at *4 ("The *C-Y-Z-* rule . . . fleshes out an issue germane to the application of [§ 601(a)] that was not addressed by Congress, and so poses no *Chevron* step one problem."). *But see Sun Wen Chen*, 2007 WL 1760658, at *10 (McKee, *J.*, dissenting) ("Rather than accept the language [of § 601(a)] as drafted, the majority concludes that the absence of 'spouse' in the statute creates a vacuum that the Attorney General may rush in and fill, even though this results in amending the statute."); *id.* at *11 (McKee, *J.*, dissenting) ("Our analysis should therefore begin and end with the language of [§ 601(a)]. There is no room here for a step two inquiry under *Chevron*. . . . I believe Congress meant what it said, and I do not assume that the omission of any reference to a 'spouse' is accidental or insignificant.").

court must . . . interpret the statute as a symmetrical and coherent regulatory scheme." (citation and internal quotation marks omitted)).

It is apparent to us that when Congress rejected the BIA's view in *Matter of Chang,* 20 I. & N. Dec. 38 (B.I.A. 1989)*,* of birth control policies in other nations as an avenue for asylum, it did so in clear and unmistakable language.  It identified those to whom asylum could be granted and reaffirmed the need for direct personal persecution.  Congress's specific designation of some persons (i.e., those who fear, resist, or undergo particular medical procedures) is incompatible with the view that others (e.g., their spouses) should also be granted asylum *per se* because of birth control policies.  The inclusion of some obviously results in the exclusion of others.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993).[8]

The language of § 601(a) does nothing to alter the pre-IIRIRA definition of "political opinion" in § 1101(a)(42), and this further demonstrates the exclusivity of the group of persons entitled to asylum *per se* under § 601(a).  Congress could have announced that the term "political opinion" included any reproductive act in violation of a coercive population control program, but instead it chose to create a specific exception to the general statutory requirement that a person claiming refugee status based on past persecution has the burden of demonstrating that the particular conduct experienced by him rose to the level of persecution and the persecution had a

---

[8] Judge Katzmann contends that we have employed this well-known canon of statutory construction to conclude that IIRIRA § 601(a) restricts, rather than expands, the availability of asylum relief.  Op. of Judge Katzmann at 5.  This contention is misplaced.  We acknowledge that IIRIRA § 601(a) expands the availability of asylum, but find it significant that it does so only to specifically-enumerated categories of asylum applications – categories that do not include the beneficiaries of the BIA's *per se* rule.

specified impermissible nexus. *See* 8 U.S.C. § 1158(b)(1)(B)(i) (stating that "[t]he burden of proof is on the applicant to establish that the applicant is a refugee"). IIRIRA § 601(a) states that certain individuals affected by coercive population control programs "shall be deemed" persecuted by reason of political opinion. In using the word "deem" in this context,[9] § 601(a) makes clear that those who benefit from the amendment would not be entitled to *per se* political opinion asylum relief absent the amendment. In other words, their political opinion exists *de jure* rather than as a matter of fact on which the applicant bears the burden of proof. For an asylum applicant who does not fall within this limited exception, the burden remains on the applicant – and the opportunity remains open – to demonstrate, in light of the particular facts of the case, that he has (i) a well-founded fear of personal persecution (ii) based on political opinion or some other impermissible ground.

This is consistent with what we know: While it is plain that suffering a forced medical procedure can be a persecution if it is on account of a protected ground, the conception of a child is no more an expression of political opinion than birth, death, sleep, or the taking of nourishment. If the language of § 601(a) indicates that the woman who is subjugated to the outrage of a forced abortion has not herself been persecuted for the "political opinion" of conceiving a child under pre-IIRIRA § 1101(a)(42), then so much less the man who has

---

[9] To "deem" is "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it doesn't have," or, in the alternative, "[t]o consider, think, or judge." *Black's Law Dictionary* 446 (8th ed. 2004). *Black's Law Dictionary* further notes that the word deem "has been traditionally considered to be a useful word when it is necessary to establish a legal fiction either positively by 'deeming' something to be what it is not or negatively by 'deeming' something not to be what it is. . . . All other uses of the word should be avoided." *Id.* (quoting G.C. Thornton, *Legislative Drafting* 99 (4th ed. 1996)).

18

impregnated her; but unlike his wife or partner, he is not "deemed" under § 601(a) to hold a political opinion and he must prove the existence of a political opinion or other protected ground under § 1158(b)(1)(B)(i). Accordingly, we conclude that the statutory scheme unambiguously dictates that applicants can become candidates for asylum relief only based on persecution that they themselves have suffered or must suffer. *See Sun Wen Chen*, 2007 WL 1760658, at *11 (McKee, *J.*, dissenting) ("Congress could have easily drafted [§ 601(a)] to extend to 'married couples who have been subjected to a forced abortion or involuntary sterilization.' So drafted, an actual victim of persecution under a coercive population control program, as well as his/her spouse, would qualify for relief under the statute. However, Congress did not draft the statute in this way, and we can not rewrite the statute's explicit text to achieve that result.").

Indeed, the critical defect in the BIA's policy of according *per se* refugee status to spouses of individuals explicitly protected by § 601(a) is its creation of an irrebuttable presumption of refugee status for a new class of persons. This policy effectively absolves large numbers of asylum applicants of the statutory burden to prove that they have (i) a well-founded fear of persecution (ii) based on an impermissible nexus. Such a presumption is contrary to the text of 8 U.S.C. § 1158(b)(1)(B), which specifies that "[t]he burden of proof is on the applicant," that "the applicant must establish that . . . political opinion was or will be at least one central reason for persecuting the applicant," and that an applicant's testimony may be sufficient to meet this burden only if it "refers to specific facts sufficient to demonstrate that the applicant is a refugee." The law is clear that "an agency is not free to ignore statutory language by creating a presumption on grounds of policy to avoid the necessity for finding that which the legislature

19

requires to be found." *United Scenic Artists v. NLRB*, 762 F.2d 1027, 1034 (D.C. Cir. 1985). The creation of such a presumption "is beyond the [agency's] statutory authority." *Id.* at 1035; *see also Cerrillo-Perez v. INS*, 809 F.2d 1419, 1426-27 (9th Cir. 1987) (holding that the "BIA cannot adopt a general presumption" unfavorable to applicant but instead "must consider the specific facts and circumstances of each case"). Thus, the BIA lacks authority to adopt a policy that presumes that every person whose spouse was subjected to a forced abortion or sterilization has himself experienced persecution based on political opinion.

Our concurring colleagues Judge Katzmann and Judge Sotomayor suggest that the political nexus prong of this presumption is, in fact, inherent in Congress's 1996 amendments. Op. of Judge Katzmann at 15; op. of Judge Sotomayor at 7. However, this contention is irreconcilable with the language of § 601(a), in which Congress created this presumption for specifically identified persons – those who were themselves subjected to or threatened with a forcible abortion or sterilization. To the extent that the amendments overruled *Matter of Chang*'s categorical rejection of such a nexus, 20 I. & N. Dec. 38, this means that an asylum applicant is no longer foreclosed from relying on evidence of a forced abortion or sterilization – whether personal or spousal – in attempting to demonstrate persecution based on political opinion. However, the fact remains that Congress has relieved only persons who actually experienced, or are threatened with, a forcible abortion or sterilization from the burden of proving a political nexus in their particular cases.

We do not deny that an individual whose spouse undergoes, or is threatened with, a forced abortion or involuntary sterilization may suffer a profound emotional loss as a partner and

20

a potential parent. But such a loss does not change the requirement that we must follow the "ordinary meaning" of the language chosen by Congress, according to which an individual does not automatically qualify for "refugee" status on account of a coercive procedure performed on someone else. *See Moskal v. United States*, 498 U.S. 103, 108 (1990) (stressing the importance of "giving the 'words used' their 'ordinary meaning.'"); *Cardoza-Fonseca*, 480 U.S. at 453 ("Where the language of [a] law[] is clear, we are not free to replace it with an unenacted legislative intent.").[10]

Under *Chevron*, once it is apparent that the statute is unambiguous, our inquiry stops. "If the intent of Congress is clear, that is the end of the matter," and we are required to refrain from deferring to an agency's contradictory interpretation. 467 U.S. at 842-43; s*ee, e.g., Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 462 (2002); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 160-61; *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 500 (1998); *MCI Telecommunications Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218, 226-28 (1994); *Cardoza-Fonseca*, 480 U.S. at 447-48. Congress's choices of language in the phrases, "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization," "[a person] who has been persecuted for failure or refusal to undergo such a procedure," and "a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure [or] refusal," is uniformly unambiguous in its reference to an *individual* who is subjected to, or threatened with, an involuntary abortion or sterilization

---

[10] If this conclusion is inconsistent with Congress's intentions, it can, if it so chooses, of course, amend the statute, as it did when it adopted IIRIRA § 601(a) in response to the BIA's decision in *Matter of Chang*, 20 I. & N. Dec. 38 (B.I.A. 1989).

21

affecting his or her own body, and the statutory scheme of § 1101(a)(42) only reinforces that conclusion.

As a result, we conclude that the statute does not provide that a spouse – and *a fortiori*, a boyfriend or fiancé – of someone who has been forced to undergo, or is threatened with, an abortion or sterilization is automatically eligible for "refugee" status. Instead, to qualify for refugee status under the amendment, such an individual must turn to the two remaining categories of § 601(a), which provide protection to petitioners who demonstrate "other resistance to a coercive population control program" or "a well founded fear that he or she will be . . . subject to persecution for such . . . resistance . . . ." 8 U.S.C. § 1101(a)(42).[11]

In *S-L-L*, the BIA was influenced by the fact that *C-Y-Z-* "is a precedent of long standing at this point . . . and numerous court decisions have deferred to the holding." *S-L-L-*, 24 I. & N. Dec. at 4; *see also id.* at 14 (Pauley, *B.M.*, concurring) ("[N]otwithstanding my belief that *Matter of C-Y-Z-*, . . . was wrongly decided, I would not overrule it now, clearly a decade later and in the aftermath of thousands of decisions applying it . . . ."). However, the Supreme Court has made clear that "*[s]tare decisis* is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision." *Payne v. Tennessee,* 501 U.S. 808, 828 (1991) (internal quotation marks omitted).

---

[11] While no party before us argues that the rule in *S-L-L-* fails under *Chevron* step one, DHS did argue this point before the BIA, and the BIA considered and rejected the argument over a persuasive dissent by two members of the Board. In any event, we cannot defer to the Department of Justice's argument (opposed below by DHS, the agency charged with enforcing immigration laws) that the rule in *S-L-L-* survives review under *Chevron* step one if the rule finds no support in the statutory text. Accordingly, we assume that the Solicitor General will take appropriate action to recommend or assure that the views of DHS and this Court will be represented in any future proceedings.

While *stare decisis* is undoubtedly of considerable importance to questions of statutory interpretation, the Supreme Court "ha[s] never applied *stare decisis* mechanically to prohibit overruling . . . earlier decisions determining the meaning of statutes." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 695 (1978). We should not do so either. The fact that we have failed to follow the plain language of a law of Congress for ten years does not require that we do so indefinitely. That would "place on the shoulders of Congress the burden of the Court's own error." *Girouard v. United States*, 328 U.S. 61, 70 (1946).

Given the clarity of the statute, there is no need to resort to legislative history, which is a tool of construction that we employ only if the statutory text at issue in the context of the statute as a whole is ambiguous. However, were we to examine the statute's legislative history, we would find that our interpretation of § 601(a) comports with Congress's stated purpose in passing the amendment. The House Report accompanying the passage of the amendment states that its

> primary intent . . . is to overturn several decisions of the Board of Immigration Appeals, principally *Matter of Chang* and *Matter of G-* . . . which . . . hold that *a person* who has been compelled to undergo an abortion or sterilization, or has been severely punished for refusal to submit to such a procedure, cannot be eligible on that basis for refugee or asylee status unless *the alien* was singled out for such treatment on account of factors such as religious belief or political opinion.

H.R. Rep. 104-469(I) at 173-74 (1996) (emphasis added).

The report mentions as examples of victims of coercive family planning policies women who have been subjected to involuntary abortions, men and women who are forcibly sterilized, and "couples with unauthorized children [who are] subjected to excessive fines," but *not* spouses

23

of individuals who have been subjected to forced abortions or sterilizations. *Id.* While Congress disapproved of coercive family planning policies as a whole, the amendment was meant to provide protection for individuals who were subjected to persecution *themselves*. As the report goes on to state:

> The Committee emphasizes that the burden of proof remains on the applicant, as in every other case, to establish by credible evidence that he or she has been subject to persecution - *in this case, to coercive abortion or sterilization - or has a well-founded fear of such treatment.* The Committee is aware that asylum claims based on coercive family planning are often made by entire groups of smuggled aliens, thus suggesting that at least some of the claims, if not the majority, have been "coached." *Section [601(a)] is not intended to protect persons who have not actually been subjected to coercive measures or specifically threatened with such measures . . . .*

*Id.* at 174 (emphasis added). There is nothing in the legislative history that leads us to question "the strong presumption that Congress expresses its intent through the language it chooses." *Cardoza-Fonesca*, 480 U.S. at 432 n.12. Here, the language Congress employed in § 601(a) demonstrates that it wanted to cover "a person," not "a couple," not a "significant other" and not an "intimate friend." Moreover, Congress's "emphasi[s]" on its intention that "the burden of proof remains on the applicant" demonstrates that no other subsection of § 1101(a)(42) could support the BIA's interpretation of the statute.[12] *See Sun Wen Chen*, 2007 WL 1760658, at \*16

---

[12] Judge Katzmann asserts that Congress, when it adopted IIRIRA § 601(a) in 1996, intended to accomplish the same goal as a 1993 order of former Attorney General Barr that was never enacted and never reviewed by any court. That order would have explicitly granted asylum to spouses of coercive family planning policy victims. Op. of Judge Katzmann at 8-9. Judge Katzmann's assertion is squarely contradicted by the plain language of IIRIRA § 601(a), which – unlike Attorney General Barr's order – does not grant asylum to spouses of persecution victims, as well as by the legislative history recounted above, which emphasizes that IIRIRA § 601(a) was not intended to make asylum available to those not explicitly protected by the amendment. Even more precarious is Judge Katzmann's reliance on the various messages he

(McKee, *J.*, dissenting) ("The House Report . . . expresses a congressional intent to restrict asylum to the 'person' who undergoes the coercive procedure just as clearly as the text of the statute.").

This reading of the statute is further supported by the Supreme Court's pronouncement about what "refugee" means. In *INS v. Elias-Zacharias*, the Supreme Court held that under the plain language of the general refugee definition subsection of § 1101(a)(42), "'persecution on account of . . . political opinion' in [§ 1101(a)(42)] is persecution on account of *the victim's* political opinion," 502 U.S. 478, 482 (1992) (emphasis in original), not persecution on account of a political opinion held by someone else. Similarly, a spouse who has not demonstrated that he himself is a victim of persecution cannot be entitled to asylum under this section of the statute. It would be unreasonable to conclude otherwise, whether under § 601(a), or under § 1101(a)(42) as a whole.[13]

Our conclusion that Congress never intended § 601 – or § 1101(a)(42) – to apply automatically to spouses is reinforced by the fact that Congress already provides for family members elsewhere in the statute by authorizing derivative asylum status for spouses and children of individuals who qualify as "refugees." 8 U.S.C. § 1158(b)(3)(A). Specifically, under

hears in the sounds of Congressional silence. Op. of Judge Katzmann at 13.

[13] In her concurring opinion, Judge Sotomayor suggests that today's holding casts doubt on *Jorge-Tzoc v. Gonzales*, 435 F.3d 146 (2d Cir. 2006) (remanding asylum claim to BIA on determination that a "combination of circumstances" experienced by applicant in Guatemala as a dependent child – including the massacre of close family members – "could well constitute [past] persecution" of the child). We do not address this concern because today's decision does not preclude the BIA from considering the totality of circumstances in any particular case to determine if an asylum applicant has carried his statutory burden.

25

§ 1158(b)(3)(A), an individual whose spouse or parent has been granted asylum on the basis of having undergone or been threatened with the prospect of a forced abortion or sterilization is automatically eligible for derivative asylum: "[a] spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien."

What Congress did by providing in § 1158(b)(3)(A) for automatic asylum for spouses of individuals who have been granted "refugee" status as a result of having been forced to undergo an abortion or involuntary sterilization reflects a policy decision to encourage the preservation of families. Under § 1158(b)(3)(A) the benefits of asylum are extended first to the person Congress understood to be most deserving of protection – the direct victim. Once the victim gains asylum, so does the spouse, and so do their children. This structure encourages couples to remain together, or, in circumstances where this is not possible, facilitates reunion.

The BIA's interpretation of the statute in *S-L-L* cuts in a different direction since it has the perverse effect of creating incentives for husbands to leave their wives. As hundreds of cases in the courts illustrate, the policy allows a married man to "capitalize on the persecution of his wife to obtain asylum even though he has left his wife behind and she might never join him and he might intend that she not do so," *Chen v. Ashcroft,* 376 F.3d 215, 223 n.2 (3d Cir. 2004). It is highly unlikely – indeed, inconceivable – that Congress would approve of, much less intended, any of this. These counterintuitive results reinforce our conclusion that in § 601(a) Congress intended to grant automatic asylum to an individual directly victimized by a coercive birth control policy, and that no part of § 1101(a)(42) extends this automatic asylum to spouses.

26

Congress did not, at the same time it adopted § 601(a), intend to gut or to undermine § 1158(b)(3)(A), which already contained a synchronous, sensible way of addressing the compelling problems faced by spouses and children of direct victims.

Although we conclude that Congress has spoken unambiguously to whether an asylum applicant is *per se* eligible for asylum if his spouse or partner has suffered as a result of a coercive population control program, the phrase "other resistance" is ambiguous and leaves room for the BIA's reasonable interpretation where the applicant relies on something beyond his spouse's or partner's persecution.[14] *See Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1203 (11th Cir. 2005) ("There is very little case law analyzing the 'other resistance' clause in the asylum statute. Additionally, a review of the legislative history behind the 1996 Amendment does not reveal any clear intent from Congress on the scope of the 'other resistance clause.'").

In its decision, the BIA held that an applicant claiming persecution for "other resistance" must demonstrate (1) "resistance" to a coercive family planning policy, which can "cover[] a wide range of circumstances, including expressions of general opposition, attempts to interfere with enforcement of government policy in particular cases, and other overt forms of resistance to the requirements of the family planning law"; and (2) that the applicant has "suffered harm amounting to persecution on account of that resistance." *S-L-L-*, 24 I. & N. Dec. at 10. An individual whose spouse or partner has been subjected to a forced abortion or involuntary

---

[14] For an analysis of what "resistance" might mean when someone has not been forcibly sterilized himself, see *Li v. Ashcroft*, 356 F.3d 1153, 1159-61 (9th Cir. 2004) (en banc) (analyzing the meaning of the "other resistance" clause and holding that it applies to a woman who announced her opposition to government population control policies and was thereafter subjected to a forced gynecological exam and threatened with future abortion, sterilization of her boyfriend, and arrest).

27

sterilization can therefore qualify for "refugee" status under this interpretation if that individual can prove past persecution or a fear of future persecution for "resistance" that is directly related to his or her own opposition to a coercive family planning policy.

Whatever interpretation the BIA chooses to give to the meaning of "resistance," it is clear that the fact that an individual's spouse has been forced to have an abortion or undergo involuntary sterilization does not, on its own, constitute resistance to coercive family planning policies. *See Zhang*, 395 F.3d at 532 ("[M]erely impregnating one's *girlfriend* is not alone an act of 'resistance.'"). Nor could the resistance of an individual's spouse or partner to a family planning policy – whether by failure or refusal to undergo a procedure, or for "other resistance" – constitute, on its own, "resistance" under regulations implementing § 1101(a)(42). Instead, as the DHS has argued, "where the applicant himself has not resisted [coercive family control policies], he would need to demonstrate, though persuasive direct or circumstantial evidence, that his wife's, fiancee's, or girlfriend's resistance has been or will be imputed to *him*." *DHS brief* at 17 (citing *Singh v. INS*, 134 F.3d 962, 970 (9th Cir. 1998)). The fact that someone's spouse has been subjected to a forced abortion or sterilization would not be irrelevant to such an analysis, it simply could not provide for asylum status *per se*.[15]

---

[15] Judge Calabresi asserts first that our holding conflicts—if not in actuality, then in "spirit," Op. of Judge Calabresi at 6 —with the Supreme Court's recent decisions in *INS v. Orlando Ventura*, 537 U.S. 12 (2002) (*per curiam*), and *Gonzales v. Thomas*, 547 U.S. 183, 126 S. Ct. 1613 (2006) (*per curiam*)**,** and second that we rush to reach a particular result. We disagree with both of these assertions. First, *Orlando Ventura* and *Thomas* held that a reviewing court should ordinarily remand rather than pass upon a matter that is (1) primarily committed to the BIA's discretion, and (2) has not yet been considered by the BIA. *See Orlando Ventura*, 537 U.S. at 16-17; *Thomas*, 126 S. Ct. at 1615. Neither of these conditions is present in this case. We, rather than the BIA, have primary authority under *Chevron* to determine whether a particular agency interpretation is consistent with the unambiguously expressed intent of

28

Before turning to the dispositions of the petitioners' claims, we address some practical implications of our decision. We affirm the result of the BIA's decision in *S-L-L-* denying *per se* refugee status to boyfriends or fiancés of individuals who have been persecuted directly under coercive family planning policies. A necessary predicate for this result is our conclusion that § 601 does not confer automatic asylum eligibility on spouses, whether legal spouses or spouses from a traditional marriage, but only on individuals who themselves have undergone or been threatened with coercive birth control procedures. Thus, although none of the petitioners before us is legally married, we understand that our reading of the statute would necessarily exclude spouses of those directly victimized from *per se* asylum eligibility as well.

We emphasize that our holding today should not be read to presage the reopening of cases of aliens who have already been granted asylum based on the BIA's interpretation of § 601 in *C-Y-Z-*. Under 8 U.S.C. § 1158(c)(2)(A), the DHS is permitted to seek the termination of asylum when an alien no longer qualifies for refugee status "because, owing to a fundamental change in circumstances relating to the original claim, the alien's life or freedom no longer would be threatened on account of race, religion, nationality, membership in a particular social group,

Congress. *See*, *e.g.*, *Cardoza-Fonseca*, 480 U.S. at 447-48.

Second, the BIA has had ample opportunity to consider the statutory interpretation question in the first instance. The *per se* rule that we now invalidate was first announced by the BIA in 1997, in its opinion in *C-Y-Z-*, 21 I. & N. Dec. at 915. In 2005, we remanded this case to the BIA to give it the opportunity to reconsider whether the rule in *C-Y-Z-* could find support in the language of § 601(a). *See Lin*, 416 F.3d at 187. On remand, DHS explicitly argued to the BIA that its *per se* rule was foreclosed by the plain language of § 601(a) and the statutory scheme. A majority of the BIA considered and rejected this argument over the forceful, and persuasive, objections of a minority of the Board. *See S-L-L-*, 24 I. & N. Dec. at 15-21 (Filppu, B.M., concurring and dissenting). We see no reason to remand yet again – ping pong style – when the BIA has had ten years and several opportunities to reconsider a rule that has no basis in statutory text.

or political opinion *in the country from which deportation or removal was withheld."* 8 C.F.R. § 208.24(b)(1) (emphasis added). Just as a change in United States asylum law does not qualify as a "change in circumstances" sufficient to reopen an asylum case under 8 C.F.R. § 1003.2(c)(3)(ii) (permitting motion to reopen "based on changed circumstances arising in the country of nationality or in the country to which deportation is ordered"), *see Azanor v. Ashcroft*, 364 F.3d 1013, 1022 (9th Cir. 2004), a change in the BIA's interpretation of section 601(a) as a result of our decision should not be seen as a "fundamental change in circumstances relating to the original claim" under 8 C.F.R. § 208.24(b)(1) so as to allow the termination of an asylum claim that has already been granted. *See S-L-L-*, 24 I. & N. Dec. at 21 n.2 (Filppu, *B.M.*, concurring and dissenting) ("We are not now concerned with reopening past cases.").

III. PETITIONERS' CLAIMS

We agree with the BIA that none of the petitioners can qualify for automatic refugee status as a result of the treatment of their girlfriends or fiancées. Instead, each petitioner must demonstrate "other resistance to a coercive population control program" or "a well founded fear that he . . . will be . . . subject to persecution for such . . . resistance . . . ." 8 U.S.C. § 1101(a)(42).

Petitioner Dong's application for asylum was based upon his fiancée's two forced abortions and threats from family planning officials that they would fine and sterilize Dong if his fiancée became pregnant again. But Dong failed to demonstrate that he acted in a manner that could constitute "resistance" or opposition to a coercive family control program. Nor can we find that Dong has a fear of future persecution as a result of the threat that the Chinese

30

government would sterilize him if his fiancée became pregnant again.  Dong submitted evidence to the immigration court that his fiancée had moved to Taiwan to be with her father.  The IJ thus found that Dong was unlikely to return to China, and his fear of sterilization was conjectural.  Moreover, as the BIA notes, were Dong's fiancée to return to China, Dong and his fiancée would now meet the age requirements for marriage.  *See In re Dong*, A. 77 293 661 (B.I.A. Nov. 27, 2006).  In addition, the immigration judge correctly determined that Dong did not demonstrate that he would "more likely than not" be persecuted as grounds for a withholding of removal, or that he would be subjected to torture within the meaning of the Convention Against Torture.  *See id.*  Accordingly, we deny Dong's petition for review.

Petitioner Lin's claim for asylum is that he and his girlfriend were refused permission to marry or have a child out of wedlock, and his girlfriend was forced to undergo an abortion.  Lin did not claim before the immigration court, the BIA, or this Court that he had "otherwise resisted" China's coercive family planning policies.  Even if he had, we agree with the BIA that a request, through the appropriate legal channels, for permission to have a child, combined with the subsequent abortion performed on his girlfriend, does not constitute "resistance to a coercive population control program."  *S-L-L-,* 24 I. & N. at 10-12.  However, we do not have jurisdiction over Lin's petition for review, as we find that his petition is moot.  Lin's attorney has informed this Court that he has never had any contact with the petitioner, and that Lin's prior attorney has not spoken to him in approximately three years.  In addition, an individual from Lin's village in China has told the attorney that "he heard from other villagers that Lin was terminally ill and had returned to China not too long ago and died."  Aff. of Yee Ling Poon ¶ 5.  When the possibility

31

of relief is "so remote and speculative that any decision on the merits . . . would amount to a 'declar[ation of] principles or rules of law which cannot affect the matter in issue in the case before [us],'" *United States v. Blackburn*, 461 F.3d 259, 262 (2d Cir. 2006) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895) (alterations in original)), we would run afoul of Article III were we to decide the claim. Given that we do not retain jurisdiction over Lin's claim if he has returned to China and has provided no explanation to overcome the presumption that his asylum application has been abandoned, *see* 8 C.F.R. § 1208.8, or if he is deceased, Lin's petition is dismissed as moot.

Petitioner Zou's petition has been remanded by the BIA to the immigration court to review its findings of adverse credibility and determine whether Zou qualifies as a refugee for "resistance" to a coercive family planning policy. *See In re Xian Zou*, No. A77 322 295 (B.I.A. Nov. 21, 2006). Accordingly, we no longer have jurisdiction over Zou's petition. *See* 8 U.S.C. § 1252(a)(1) (giving courts of appeals jurisdiction to review only final orders of removal).

CONCLUSION

For these reasons, the petition for review of Zhen Hua Dong is DENIED. The petitions for review of Shi Liang Lin and Xian Zou are DISMISSED for lack of jurisdiction.

KATZMANN, Circuit Judge, with whom Judges Straub, Pooler, and Sotomayor join, concurring in the judgment:

With the majority's emphasis on denying asylum relief to legal spouses under § 101(a)(42) of the Immigration and Nationality Act (the "INA"), it is easy to lose sight of one fact central to the disposition of these cases: Not one of the petitioners in these consolidated cases was married. In each case, it was the plaintiff's girlfriend, not his wife, who was forced to abort her pregnancy. It is thus unnecessary for us to resolve whether the BIA can legally extend asylum relief to legal spouses; indeed, in doing so, we are addressing not only an issue not presently before us, but also one that the parties in these cases do not even dispute. In their briefs before us, both the petitioners and the Government agree that the statute is ambiguous.[1] The question the parties dispute, and the only one that these cases require us to answer, is whether the BIA's interpretation of the statute as applied to boyfriends and fiancés is reasonable. Every judge on this Court who reaches this issue agrees that it is.

Thus, this case could have been resolved simply and nearly unanimously by assuming the reasonableness of the BIA's construction of the statute as applied to legal spouses and then holding that it was also reasonable as applied to boyfriends and fiancés. *See Cai Luan Chen v.*

---

[1] The Department of Homeland Security ("DHS") advanced a different view before the BIA. The majority "assume[s] that the Solicitor General will take appropriate action to recommend or assure that the views of DHS and this Court will be represented in any future proceedings." Maj. Op. at 23 n.11. In so doing, the majority ignores the historic independence of the Office of the Solicitor General in determining the executive branch's position before the Supreme Court. When agencies of the executive branch have taken inconsistent positions, as they have here, the Solicitor General may choose among those positions, or it may adopt any other available litigation position. The Solicitor General has no obligation to endorse the preferred legal theory of the court below. To the extent the majority attempts to influence the position the Solicitor General will take in future proceedings, that effort is inappropriate.

34

*Ashcroft*, 381 F.3d 221, 227 (3d Cir. 2004) (Alito, J.) (assuming "for the sake of argument" that "C–Y–Z–'s interpretation is permissible" as applied to legal spouses and then determining whether the BIA was reasonable in distinguishing "between married and unmarried couples"). Instead, the majority has gone out of its way to create a circuit split where none need exist, *see* Maj. Op. at 5 n.4, thereby frustrating the BIA's uniform enforcement of a national immigration policy.[2] Finding in textual silence an expression of unambiguous congressional intent, the majority has rejected the BIA's determination that § 101(a)(42) is ambiguous.

When a governmental body with substantial experience in interpreting a complex statutory scheme concludes that a statute is ambiguous, that determination should give us pause. Here, the fact that the BIA concluded that the INA is ambiguous with respect to the question we are called upon to answer suggests that we would do well to probe further, to consider whether the seemingly plain language belies a more complicated meaning. It suggests that we should consider carefully not only the text of the statute, but also the context—both the events that gave rise to that text and the various agency and judicial responses to it. Text without context can lead to confusion and misunderstanding. The majority's analysis is testament to that proposition.[3]

---

[2] In a related context, we remanded to the BIA to address the proper scope of the term "refugee" in the first instance, noting that "it would be unsound for each of the several Courts of Appeals to elaborate a potentially nonuniform body of law" and describing uniformity as "especially desirable in cases such as these." *Jian Hui Shao v. BIA*, 465 F.3d 497, 502 (2d Cir. 2006).

[3] The majority finds my decision to engage in this analysis "perplex[ing]" given my belief that we need not—and should not—answer today a question that this case does not require us to answer and the proper resolution of which the parties do not dispute. Although I believe we should have limited our decision to the BIA's treatment of boyfriends, the majority has

35

In answering the first of the questions set out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), that is, whether "the statute is silent or ambiguous with respect to the specific issue," *id.* at 843, we must look to the text of § 101(a)(42) of the INA. That text provides, in pertinent part, that a refugee is

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution . . . on account of . . . political opinion . . . . For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization . . . shall be deemed to have been persecuted on account of political opinion . . . .

8 U.S.C. § 1101(a)(42). The majority focuses its textual analysis on the final sentence of that provision, that is, § 601(a) of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), concluding that the BIA's decision "rested on" that sentence, and not the general definition of "refugee" in 8 U.S.C. § 1101(a)(42). Maj. Op. at 10. Yet, as the majority notes, the BIA found that "'[t]here is no clear or obvious answer to the scope of the protections afforded by the amendment to partners of persons forced to submit to an abortion or sterilization.'" Maj. Op. at 13.[4] Reasoning that the "lack of . . . a reference" to spouses in the

nonetheless chosen to address its treatment of husbands. I would be remiss if I did not discuss both why I believe the majority's discussion of this issue is unnecessary and also why I believe it is wrong.

[4] Although we remanded to the BIA to "more precisely explain its rationale for construing IIRIRA § 601(a)" to protect spouses, *Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 187 (2d Cir. 2005), nothing in that decision precluded the BIA from looking to the more general language in the statute in determining whether to extend relief to spouses. Indeed, the BIA had the authority to interpret the meaning of 8 U.S.C. § 1101(a)(42) independent of our remand in *Lin*. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("The Attorney General . . . has vested the BIA with power to exercise the discretion and authority conferred upon the Attorney General by law in the course of considering and determining cases before it. Based on

36

1996 amendment "does not necessarily preclude an applicant from demonstrating past persecution based on harm inflicted on a spouse when both spouses are harmed by government acts motivated by a couple's shared protected characteristic," the Board looked to the "general principles regarding nexus and level of harm" for guidance. *In re S–L–L–*, 24 I. & N. Dec. 1, 5 (B.I.A. 2006); *see also id.* at 5 n.5 (citing to the general regulatory framework that defines when an applicant may qualify as a refugee); *id.* at 6 (considering the "well-established principles regarding nexus and level of harm for past persecution").

Thus, although the majority places great emphasis on its view that the "language in § 601(a) . . . is unambiguous and . . . does not extend automatic refugee status to spouses or unmarried partners of individuals § 601(a) expressly protects," Maj. Op. at 4, I find the focus on the amendment misplaced. I believe we must look instead to the entirety of 8 U.S.C. § 1101(a)(42) to determine whether the statute is ambiguous. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").[5] That section provides that a "refugee" is any

___

this allocation of authority, we [have] recognized . . . that the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication . . . ." (quotation marks and citation omitted)); *see also Kuhali v. Reno*, 266 F.3d 93, 102 (2d Cir. 2001) (granting "*Chevron* deference to the Board's construction of the INA, which it . . . administer[s]").

[5] Even if the BIA construed only the 1996 amendment, it would still be necessary to consider the text of the entire statute and the context against which that amendment was enacted to determine whether the 1996 amendment is itself ambiguous within the meaning of *Chevron*. *See Natural Res. Def. Council v. Abraham*, 355 F.3d 179, 198 (2d Cir. 2004) ("In interpreting the plain language of the statute, we must look to the particular statutory language at issue, as well as the language and design of the statute as a whole, and, where appropriate, its legislative

individual who cannot return to his or her home country because of "persecution . . . on account of . . . political opinion." None of these terms is defined in any way, and none explicitly addresses whether the spouses of those who have been forced to undergo an abortion or sterilization are entitled to asylum relief.[6] Hence, the statute, on its face, does not "directly address[] the precise question at issue." *Chevron*, 467 U.S. at 843; *cf. Sun Wen Chen v. U.S. Att'y Gen.*, No. 05-4011, 2007 WL 1760658, at *4 (3d Cir. June 20, 2007) ("[T]he *C–Y–Z–* rule thus fleshes out an issue germane to the application of § 1101(a)(42)(B) that was not addressed by Congress, and so poses no *Chevron* step one problem.").

Indeed, the majority points to no language in the statute that explicitly denies asylum relief to these spouses, or that precludes the BIA from extending it to them. *Cf.* 8 U.S.C. § 1101(a)(42) (explicitly precluding from the definition of "refugee" individuals "who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion"). Rather, the majority takes the position that "Congress's specific designation of some persons (i.e., those who fear, resist, or undergo particular medical procedures) is incompatible with the view that others (e.g., their spouses) should also be granted asylum *per se* because of birth control policies. The

history." (quotation marks omitted)). Because I believe the BIA held that the entire provision was ambiguous, it is not necessary to determine here whether the 1996 amendment alone is ambiguous. Thus, contrary to Judge Calabresi's suggestion, Judge Calabresi Op. at 16 n.6, I do not necessarily agree that the BIA could not have relied on § 601(a) to provide asylum relief to spouses.

[6] I agree with Judge Calabresi that this "general language" in 8 U.S.C. § 1101(a)(42) means that the BIA, with its expertise in this area, is particularly well-suited to exercise its discretion and decide how that language should be interpreted. Judge Calabresi Op. at 8. Judge Calabresi and I differ as to whether the BIA has already exercised that discretion.

38

inclusion of some obviously results in the exclusion of others." Maj. Op. at 17-18. But where the majority reads the language of the 1996 amendment and sees it as a limitation on the availability of asylum relief, I see it, in the context in which it was enacted, as an expansion of that relief.

I believe one question is fundamental: What was Congress's purpose in enacting the 1996 amendment? *Cf. Ai Feng Yuan v. U.S. Dep't of Justice*, 416 F.3d 192, 197 (2d Cir. 2005) (noting the "canon of statutory construction that requires us to reconcile a statute's plain language with its purpose"). In answering that question, we should not limit our inquiry to the language of the amendment; instead, we must look at the statutory scheme of which that amendment is a part and the legislative activity that led to its enactment. Congress's intent in enacting IIRIRA § 601(a) was to clarify that, contrary to the BIA's prior rulings, the imposition of some aspects of China's family planning policy can constitute persecution on the basis of political opinion, and that certain victims of that persecution are entitled to protection under our asylum laws. Nothing in the amendment suggests that Congress intended to prevent the BIA from extending relief to victims other than those explicitly identified in the amendment. *See Sun Wen Chen*, 2007 WL 1760658, at *6 ("We are not convinced that Congress, in expanding asylum to include more reproductive rights-based claims, intended to define the outer limits of relief in such cases."). There is thus some irony in the majority's approach: By giving short shrift to context, it infers an intent to limit the availability of asylum relief; had it looked more closely at context, it would have recognized Congress's intent was only to expand that relief.[7] Context makes clear what

_____

[7] The majority's recognition that § 601(a) expanded the availability of asylum relief does nothing to explain why this language, which by its terms *only* expands relief, should also be read

text alone fails to convey.

The INA provides asylum relief to individuals who have been "persecut[ed] . . . on account of . . . political opinion," but does not define those terms. In *Matter of Chang*, 20 I. & N. Dec. 38 (B.I.A. 1989), the BIA held that whatever else "persecution" might mean, it did not encompass any retribution visited upon individuals who violated China's "one couple, one child" policy. The BIA ruled that the policy "is [not] on its face persecutive" and does not "persecut[e] any portion of the Chinese citizenry on account of one of the reasons enumerated in section 101(a)(42)(A) of the Act." *Id.* at 43, 44.

Others in the executive branch took a different view. The next year, the Department of Justice issued "interpretative rules and general statements of policy for establishing statutory eligibility for asylum or withholding of deportation on the basis of political opinion for aliens who express a fear of coercive population control policies in their homeland." Refugee Status, Withholding of Deportation and Asylum; Burden of Proof, 55 Fed. Reg. 2803, 2804 (Jan. 29, 1990).[8] President George H.W. Bush reaffirmed his Administration's support of the interim rule

---

to have limited the BIA's preexisting authority to further expand it. Although the majority suggests that I rely on "messages [I] hear[] in the sounds of Congressional silence," Maj. Op. at 26 n.12, all that I actually find in silence, especially given the context, is ambiguity. *See Chevron*, 467 U.S. at 843 (noting that we turn to *Chevron* step two "if the statute is silent or ambiguous with respect to the specific issue"); *see also Sun Wen Chen*, 2007 WL 1760658, at *3 ("*Chevron* deference embodies the judgment that agencies, rather than courts, ought to serve as gap-fillers in situations of statutory silence."). It is the majority that appears to find in silence clear evidence of Congress's intent.

[8] These amendments to the asylum regulations appear to contemplate the possibility that asylum relief would be available to the spouses of those who were subject to forced abortion or sterilization. *See* Refugee Status, 55 Fed. Reg. at 2805 (to be codified at C.F.R. § 208.5(b)(2)) ("An applicant who establishes that the applicant (or applicant's spouse) has refused to abort a pregnancy or to be sterilized in violation of a country's family planning policy, and who has a

40

with the promulgation of Executive Order 12,711, which provided for "enhanced consideration under the immigration laws for individuals from any country who express a fear of persecution upon return to their country related to that country's policy of forced abortion or coerced sterilization." Exec. Order No. 12,711, 55 Fed. Reg. 13,897, 13,897 (Apr. 11, 1990).

Although the INS, in July 1990, set forth a final rule that did not address this issue, *see* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 Fed. Reg. 30,674 (July 27, 1990), the Office of the General Counsel of the INS subsequently sent a letter to Regional and District Counsel stating that "Department of Justice and INS 'policy with respect to aliens claiming asylum or withholding of deportation based upon coercive family planning policies is that the application of such coercive policies does constitute persecution on account of political opinion.'" *Xin-Chang Zhang v. Slattery*, 55 F.3d 732, 740 (2d Cir. 1995), *superseded by* 8 U.S.C. § 1101(a)(42) (quoting INS letter to Regional and District Counsel).

In January 1993, Attorney General William P. Barr signed a final rule that would have made this view law. It provided, in pertinent part, that "[a]n applicant (and the applicant's spouse, if also an applicant) shall be found to be a refugee on the basis of past persecution on account of political opinion if the applicant establishes that, pursuant to the implementation . . . of a family planning policy . . . the applicant has been forced to abort a pregnancy or to undergo sterilization or has been persecuted for failure or refusal to do so." AG Order No. 1659-93, at 14

well-founded fear that he or she will be required to abort the pregnancy or to be sterilized or otherwise persecuted if the applicant were returned to such country may be granted asylum."); *see also id.* (to be codified at C.F.R. § 242.17(c)) ("Eligibility for withholding of deportation on account of political opinion is established by the respondent who establishes that he or she (or respondent's spouse) will be required to abort a pregnancy or to be sterilized . . . .").

41

(Jan. 15, 1993) (to be codified at 8 C.F.R. 208) ("January 1993 Rule"). Although this rule was sent to the Federal Register, where it was made available for public inspection and scheduled for publication, it was never published due to the change in presidential administrations. *Xin-Chang Zhang*, 55 F.3d at 741. In February, additional regulations pertaining to asylum were published, but these made no mention of the January rule. *Id.*

Against the background of these conflicting BIA decisions and administrative regulations, we were asked to determine whether asylum relief was available to victims of China's family planning policy. We held that such relief was not available, explaining that "[e]ven were we to accept [the] view that the 'administrative cacophony' surrounding the issue justified diminished deference to *Chang*, our result would not change. It is difficult to frame a result different from the holding of *Chang* that would be 'reasonable' under both *Elias-Zacarias* and the existing immigration laws." *Id.* at 752; *see also INS v. Elias-Zacarias*, 502 U.S. 478 (1992). We did not stop there, however. Instead, we called upon Congress and the President to determine whether relief should be available to the victims of China's family planning policy: "No doubt, the President and the Congress acting together have power to create an exception to the existing immigration laws for PRC citizens . . . ." *Id.*

The next year, Congress enacted IIRIRA § 601(a). The House Committee Report explained that Congress's "primary intent" in amending the definition of refugee was "to overturn several decisions of the [BIA], principally *Matter of Chang* and *Matter of G–*," H.R. Rep. No. 104-469(I), 1996 WL 168955, at *173 (1996), in which the BIA had held that "the

Chinese Government's implementation of its family planning policies is not on its face persecutive and does not by itself create a well-founded fear of persecution on account of one of the five grounds delineated in the Act, even to the extent that involuntary sterilization may occur," *Matter of G-*, 20 I. & N. Dec. 764, 778 (B.I.A. 1993); *Matter of Chang*, 20 I. & N. Dec. at 43-44; *see also Junshao Zhang v. Gonzales*, 434 F.3d 993, 995 (7th Cir. 2006) ("The impact of that amendment was to overrule *Chang*, and allow for the granting of asylum applications in cases in which the claim of persecution stemmed from the enforcement of China's coercive population control policies."); H.R. Rep. No. 104-469(I), 1996 WL 168955, at *174 (criticizing the BIA decisions for "effectively preclud[ing] from protection persons who have been submitted to undeniable and grotesque violations of fundamental human rights"); *id.* (noting that "the BIA's rationale for these opinions—that policies of coercive family planning are 'laws of general application' motivated by concerns over population growth, and thus are not 'persecutory'—is unduly restrictive").[9]

When Congress stated that "[f]or purposes of determinations under this [Act], a person who has been forced to abort a pregnancy or to undergo involuntary sterilization . . . shall be deemed to have been persecuted on account of political opinion," 8 U.S.C. § 1101(a)(42)(a), it was not providing an exhaustive list of those who could claim asylum relief because they were

---

[9] As previously noted, Attorney General Barr had attempted to "supersede the [BIA] decision in *Matter of Chang*," January 1993 Rule, at 4-5, but his efforts fell victim to a change in presidential administrations. *See Xin-Chang Zhang*, 55 F.3d at 741. Noting that the next administration had thus far failed to take action, Congress stepped in to accomplish the same goal through legislation. *See* H.R. Rep. No. 104-469(I), 1996 WL 168955, at *174 ("[T]he Administration, which has the authority to overrule the BIA decisions through regulation or through decision of the Attorney General, has not done so. Nor has it offered adequate relief to persons who have undergone such coercion.").

43

victimized by China's family planning policy. Rather, it was expressing a congressional determination that, contrary to the BIA's prior rulings, China's "one couple, one child" policy is on its face persecutory, and victims of that policy who experienced persecution should be able to qualify for asylum relief without making an additional showing of their own political opinion.

The majority takes the position that § 601(a) does not "alter the pre-IIRIRA definition of 'political opinion' in § 1101(a)(42)" and that, for the individuals identified in § 601(a), "their political opinion exists *de jure* rather than as a matter of fact on which the applicant bears the burden of proof." Maj. Op. at 18, 19. It notes, in this regard, that the amendment provides that those who have been subjected to forced procedures "'shall be deemed' persecuted by reason of political opinion," Maj. Op. at 18-19, and that "[t]o 'deem' is '[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it doesn't have,'" Maj. Op. at 18-19 n.9 (quoting *Black's Law Dictionary* 446 (8th ed. 2004)). But, as the majority acknowledges, there is more than one definition of the word "deem"; it may also mean "[t]o consider, think, or judge." *Black's Law Dictionary* 446 (8th ed. 2004). Thus, in this context, Congress's use of the word "deemed" may mean that these individuals should be "judged" as having been persecuted on account of political opinion, just as the proposed 1993 rule provided that these applicants "shall be found to be . . . refugee[s] on the basis of past persecution on account of political opinion." January 1993 Rule, at 14.[10] Indeed, the legislative history suggests that Congress was

_____

[10] That two definitions of the term exist suggests, at the very least, that there is ambiguity in Congress's use of the term, and the fact that *Black's Law Dictionary* may favor one definition is hardly sufficient to dispel that ambiguity. Indeed, although *Black's Law Dictionary* may describe the majority's preferred usage as the more "traditional[]" one and may discourage other uses, the word "deem" has long been used to mean "consider, think, or judge." *See, e.g.*, U.S. Const. art. V ("The Congress, whenever two thirds of both Houses shall *deem* it necessary, shall

44

not attempting to create an exception to *Matter of Chang*, but to overrule it; and if Congress were attempting to carve out an exception to the normal requirement that applicants must establish that they have faced persecution on account of one of the protected grounds, it could have done so in much plainer language. In any event, the statute is, at a minimum, ambiguous, and it is the BIA, not the courts, that is charged with construing the statute in the face of that ambiguity.

Other circuits to have considered this issue have held that when Congress enacted the 1996 amendment it intended to protect both members of couples that are targeted under China's family planning policy. *See, e.g.*, *Junshao Zhang*, 434 F.3d at 999 ("Congress passed § 601(a)(1) of the IIRIRA to ensure that *families* who are victims of forced abortion and sterilization under China's population control policy would receive asylum . . . ." (emphasis added)); *Kui Rong Ma v. Ashcroft*, 361 F.3d 553, 559 (9th Cir. 2004) (identifying "Congress's goal in passing the amendments—to provide relief for '*couples*' persecuted on account of an

propose Amendments to this Constitution . . . ." (emphasis added)); 15 U.S.C. § 80b-3(j) ("The Commission is authorized to adopt rules, regulations, and orders . . . as it *deems* appropriate to implement this subsection." (emphasis added)).

Indeed, Congress has repeatedly used the term "deem" in the INA itself to mean "consider, think, or judge." *See, e.g.*, 8 U.S.C. § 1101(a)(27)(J)(i) (defining the term "special immigrant" to include "an immigrant who is present in the United States . . . who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State and who has been *deemed* eligible by that court for long-term foster care due to abuse, neglect, or abandonment" (emphasis added)); *id.* § 1103(a)(3) (providing that the Secretary of Homeland Security may "perform such other acts as he *deems* necessary for carrying out his authority under the provisions of this chapter" (emphasis added)). A "normal rule of statutory construction" provides that "identical words used in different parts of the same act are intended to have the same meaning." *Beharry v. Ashcroft*, 329 F.3d 51, 61 (2d Cir. 2003) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (quotation marks omitted)). Even if this rule does not conclusively resolve any ambiguity created by the existence of the two definitions, Congress's use of the allegedly disfavored definition elsewhere in the INA renders the meaning of "deemed" in § 1101(a)(42), at the very least, ambiguous.

'unauthorized' pregnancy and to keep *families* together" (emphasis added)).  We need not go as far as these courts to affirm the BIA's decision here.  Even if Congress did not specifically intend to protect "couples," there is nothing in the text of the amendment, or the context that gave rise to it, that indicates that it intended to preclude the BIA from extending asylum relief to both members of a couple.  *See Sun Wen Chen*, 2007 WL 1760658, at *5 (granting *Chevron* deference to the BIA's interpretation in *In re S–L–L–*).[11]

Just as nothing in the language or history of the amendment indicates a congressional intent to foreclose the extension of relief to spouses, Congress has done nothing to indicate such an intent in the years since the amendment's enactment, notwithstanding that the BIA interpreted § 1101(a)(42) to cover spouses *a decade ago* and numerous courts of appeals have upheld this interpretation as reasonable.  *See, e.g.*, *Yuan*, 416 F.3d at 197; *Junshao Zhang*, 434 F.3d at 999; *Kui Rong Ma*, 361 F.3d at 559 ("The BIA and the courts have uniformly applied the statute's

_____

[11] Although "[g]eneral language of a statutory provision . . . will not be held to apply to a matter specifically dealt with in another part of the same enactment," *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932), that rule has no applicability here where the specific provision does not address whether spouses should be entitled to relief.  In the 1996 amendment, Congress identified a particular category of individuals entitled to relief, but left to the BIA the task of determining whether to expand upon that relief, just as the BIA  routinely defines what individuals are entitled to asylum relief in a myriad of other contexts.

Indeed, there is some language in the legislative history which suggests that Congress may have considered the possibility that individuals other than those who had been forced to undergo an abortion or sterilization might qualify for asylum.  The House Committee Report on the amendment noted that "[d]etermining . . . whether the actual or threatened harm rises to the level of persecution is a difficult and complex task, but no more so in the case of claims based on coercive family planning than in cases based on other factual situations.  Asylum officers and immigration judges are capable of making such judgments." H.R. Rep. No. 104-469(I), 1996 WL 168955, at *174.  If only those subjected to the procedures could claim asylum relief, immigration judges and the BIA would never have needed to consider whether an applicant's harm rises to the level of persecution, given that the amendment explicitly provides that a forced abortion or sterilization does rise to this level.

protections to husbands whose wives have undergone abortions or sterilization procedures, as well as to the wives themselves."); *In re C–Y–Z–*, 21 I. & N. Dec. 915, 918-19 (B.I.A. 1997) (en banc). There are obscure areas of public policy, largely hidden from public attention and concern, in which it makes little sense to ascribe meaning to the absence of congressional response to administrative and judicial interpretations of a statute. Immigration is hardly one of those areas. To the contrary, immigration—and the issue of the appropriate scope of asylum relief—have consistently been on Congress's radar. Immigration is frequently in the news, and Congress has repeatedly legislated in this area. Indeed, as recently as 2005, Congress revisited this very provision and removed the annual cap on the number of asylees who could be admitted under it. *See* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, §§ 101(g)(2), (h)(5), 119 Stat. 231, 305-06 (May 11, 2005). While the fact that Congress, in the course of its active attention to immigration issues and legislation, has not amended 8 U.S.C. § 1101(a)(42) in light of the interpretation it has been given by the BIA and the courts does not definitively mean that Congress intended to protect spouses, it does suggest, at the very least, that it was not Congress's intent to foreclose that relief.

The majority nonetheless holds that it was "not correct" for the BIA to construe the general definition of "refugee" to allow for the provision of this relief because "the statutory scheme unambiguously dictates that applicants can become candidates for asylum relief only based on persecution that they themselves have suffered or must suffer." Maj. Op. at 19. I agree that an individual must have personally experienced persecution to be entitled to asylum relief, but that statement begs the question of what constitutes persecution.

47

The statute does not, in either the 1996 amendment or in its general definition of the term "refugee," prescribe exactly how much harm or what kind of harm an individual must experience to have been "persecuted" within the meaning of the statute. *See Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 340 (2d Cir. 2006) (noting that the term "persecution" is "not defined by the Immigration and Nationality Act"); *see also Matter of Acosta*, 19 I. & N. Dec. 211, 222 (B.I.A. 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (B.I.A. 1987) (defining persecution as "either a threat to the life or freedom of, *or the infliction of suffering or harm upon*, those who differ in a way regarded as offensive" (emphasis added)); *see also Ivanishvili*, 433 F.3d at 341 (acknowledging the BIA's definition of "persecution" as "the infliction of suffering or harm upon those who differ on the basis of a protected statutory ground."). The 1996 amendment states that when one is forced to undergo an abortion or sterilization, the harm thereby experienced is sufficient to qualify for asylum, but it hardly makes that level of harm necessary.

The majority may view the 1996 amendment as providing that only individuals who have undergone a forced abortion or sterilization have experienced "persecution." If so, we again differ on our interpretation of the significance of the 1996 amendment. I believe Congress enacted the 1996 amendment not primarily to define the term "persecution," but to clarify what it means to be persecuted "on account of political opinion." As noted above, Congress sought to make clear, contrary to the BIA's earlier decision in *Matter of Chang*, that the imposition of penalties through the implementation of China's family planning policy can constitute persecution "on account of political opinion" by effectively adopting the position taken in the

48

commentary to the 1993 rule that, "[a]lthough . . . prosecution and punishment under a law of general applicability will not ordinarily constitute persecution 'on account of' one of the statutory grounds, . . . [p]ersecution on account of political opinion encompasses persecution of people whose violation of laws may not be motivated by their political opinions but is regarded by the state as political disloyalty." January 1993 Rule, at 8.

Thus, I do not think that § 601(a) unambiguously defines the term persecution, and the majority has pointed to nothing in the statute that suggests that the emotional and psychological harm one suffers when one's spouse is forced to undergo an abortion or sterilization is not severe enough to constitute persecution. Nor does anything in the statute preclude the BIA from considering the effect that China's family planning policies may have on a couple's shared right to reproduce and raise children. Because Congress did not specifically address these issues, the statute is ambiguous. It therefore falls to the BIA to determine whether the harm an individual experiences when his or her spouse is subjected to a forced abortion or sterilization is sufficient to constitute persecution. *See, e.g.*, *Kuhali*, 266 F.3d at 102 (granting "*Chevron* deference to the Board's construction of the INA, which it . . . administer[s]"); *cf. Sun Wen Chen*, 2007 WL 1760658, at *5 (noting that the BIA "exercised its delegated gap-filling authority reasonably" when it recognized the harms an individual experiences as a result of the forced abortion or sterilization of his spouse). By holding that persecution cannot encompass such individuals, the majority, as Judge Sotomayor cogently explains, usurps the BIA's task of giving meaning to ambiguous statutory terms. Further, by suggesting that the BIA is creating a presumption which allows individuals to be granted asylum without proving that they were "persecuted . . . on

49

account of political opinion," the majority errs. The BIA here created no presumption; rather, fulfilling a basic responsibility, it simply discerned the meaning of those ambiguous terms.[12]

Finally, the majority finds support for its reading of the statute in its perception that there is some tension between this rule and the provision of derivative asylum status for spouses of individuals who qualify as "refugees." Maj. Op. at 26-28. But in adopting this rule, the BIA provided a basis by which individuals could claim asylum relief in their own right for harm they suffered as a result of their spouses' forced abortion or sterilization. There is no apparent tension in providing derivative asylum status to spouses who have not themselves suffered any harm and providing an additional basis of relief to those spouses who have, that is, those who have themselves suffered harm when their partners were subjected to a forced abortion or sterilization. *See* 8 U.S.C. § 1158(b)(3)(A) (providing derivative asylum to spouses who are "not otherwise eligible for asylum under this section"); *cf. Junshao Zhang*, 434 F.3d at 1001 (noting that "it would be particularly perverse for courts to treat a subsequent break-up of the marriage as somehow lessening the impact of [the prior] persecution [of the husband]"). Because there is no tension in providing these two separate, distinct forms of relief, it does not seem to me that the availability of derivative asylum relief unambiguously precludes the BIA from providing an

---

[12] The majority's assertion that § 601 "relieve[s] . . . persons who actually experienced a forcible abortion or sterilization from the burden of proving a political nexus" is similarly problematic. Maj. Op. at 21. In my view, Congress did not relieve anyone of the burden of proving political nexus. Rather, it determined that an applicant can meet this burden by establishing proof of persecution pursuant to a coercive family planning policy. Given the majority's agreement that any asylum applicant may "rely[] on evidence of a forced abortion or sterilization—*whether personal or spousal*—in attempting to demonstrate persecution based on political opinion," Maj. Op. at 21 (emphasis added), I fail to see what additional evidence an applicant whose spouse was subjected to a forced abortion or sterilization would have to show to carry his burden of proving political nexus.

50

additional basis of relief to those whose spouses have been subjected to a forced abortion or sterilization. *See Sun Wen Chen*, 2007 WL 1760658, at *4 ("We . . . do not believe that the existence of derivative asylum status under a statute implies that Congress intended to foreclose additional pathways to asylum specific to spouses.").

At bottom, the majority seems to be motivated by a concern that the BIA's rule will "gut or . . . undermine" the availability of derivative asylum relief or have "the perverse effect of creating incentives for husbands to leave their wives." Maj. Op. at 28, 27. But nothing in the BIA's rule denies relief of any kind to husbands who come to this country with their wives; moreover I think it very likely that husbands will find it advantageous to come with their wives when possible because doing so will buttress the credibility of their claims. In the end, however, my views of the policy consequences of the BIA rule are immaterial; so, too, are those of the majority. Once we determine that the statute is ambiguous, we must defer to the BIA's interpretation of the statute if it is reasonable, whatever our own personal policy preferences. *See, e.g.*, *Udall v. Tallman*, 380 U.S. 1, 16 (1965) ("To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." (quotation marks omitted)).

In considering the reasonableness of the BIA's interpretation under step two of *Chevron*, our charge is not to determine whether the BIA's interpretation of the statute is the one we would have adopted in the first instance. Instead, "the question for the court is whether the agency's answer is based on a permissible construction of the statute"; we must defer to "legislative

51

regulations . . . unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843, 844. Here, in determining whether to extend asylum relief to spouses, the BIA reasonably considered the general principles underlying the definition of persecution and concluded that a husband is persecuted "when the government forces an abortion on a married couple." *In re S–L–L–*, 24 I. & N. Dec. at 6; *see also id.* ("When the government intervenes in the private affairs of a married couple to force an abortion or sterilization, it persecutes the married couple as an entity."). I see no reason why the BIA could not reasonably conclude that one has suffered harm or injury sufficiently severe to constitute persecution when one's spouse is forced to undergo an abortion or sterilization. Indeed, this determination finds support in the decisions of a number of courts that have explicitly recognized that non-physical harm may support a finding of past persecution in at least some circumstances. *See Junshao Zhang*, 434 F.3d at 1001 (rejecting explicitly the "notion that [a husband] suffers no persecution independent of his wife, as the result of the forcible abortion of his child" and holding that "[a]lthough his wife was certainly a very direct victim of China's population control measures, Zhang was a victim as well. The forcible abortion has deprived him of his unborn child, of the ability to realize the family that his wife and he had desired, and forever deprived him of the ability to become a parent to that unborn son or daughter with his wife"); *see also Ouk v. Gonzales*, 464 F.3d 108, 111 (1st Cir. 2006) (noting that "[u]nder the right set of circumstances, a finding of past persecution might rest on a showing of psychological harm" (quotation marks omitted)); *Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004) ("Persecution may be emotional or psychological, as well as physical."); *Abay v. Ashcroft*, 368 F.3d 634, 642 (6th Cir.

2004) (holding that the applicant was entitled to asylum "based on her fear that her daughter will be forced to undergo female genital mutilation" because her "fear of . . . being forced to witness the pain and suffering of her daughter is well-founded").

The BIA also determined that there were not "convincing reasons to extend the nexus and level of harm attributed to a husband who was opposed to his wife's forced abortion to a boyfriend or fiancé." *In re S–L–L–*, 24 I. & N. Dec. at 9.[13] Recognizing that "marriage place[s] the husband in a distinctly different position from that of an unmarried father," *id.*, the BIA noted that unmarried fathers do not bear the same legal and societal responsibility for violations of family planning policies. Indeed, because their relationships with their partners are not registered with the government and may not even be known within the community, the government may often be unaware of their identities. *See id.* at 9-10. The BIA thus presumed that the family planning officials target legal spouses for persecution to a greater extent than boyfriends and fiancés. *See id.* Furthermore, "[p]roof or presumption of paternity . . . may be considerably more difficult when a boyfriend claims to have fathered a child who was forcibly aborted by government officials." *Id.* at 10. Although, as the BIA itself acknowledges, "drawing the line at marriage is not" perfect, *id.* at 9, and reasonable policymakers could differ as to how to draw the line, I cannot say that, under the deferential standard which guides us, the

---

[13] Because petitioner Dong, the only petitioner whose claim we address on this appeal, had not participated in a traditional marriage ceremony, I need not determine now whether the BIA's rule would also be reasonable as applied to individuals who were not old enough to marry under Chinese law and who participated in such a ceremony. *Compare Junshao Zhang*, 434 F.3d at 999 (holding that the BIA rule is unreasonable in this context), *and Kui Rong Ma*, 361 F.3d at 560 (same), *with Cai Luan Chen*, 381 F.3d at 231 (holding that the BIA rule is reasonable).

53

BIA's reading is not based on a permissible construction of the statute. *See Chevron*, 467 U.S. at 843.[14] If Congress disagrees with the BIA's interpretation, it can overturn the decision.[15]

This case presents difficult and challenging questions at the heart of our immigration laws. How we respond will affect the hopes and dreams of human beings seeking to live in freedom. In enacting the INA, Congress established a framework for determining when asylum relief should be provided to such individuals, and in doing so, it delegated considerable authority to the BIA to fill in statutory gaps and define the broad language used in the INA. It is in situations such as these that we should be particularly mindful of the views of the agency charged by Congress with administering the statute, views that will reflect the agency's considerable experience and expertise. We should recognize that in such circumstances what is advanced as the obvious answer may not be the right one. Here, the meaning of the text becomes much less clear when one examines context, and the BIA, recognizing that ambiguity, has offered a reasonable interpretation of the statute. I would defer to that interpretation.

---

[14] Because petitioner Dong was not married and has not otherwise established his eligibility for asylum relief, I agree with the majority that his petition for review should be denied. I also agree that the petitions of Lin and Zou should be dismissed.

[15] The BIA, too, remains free to revisit its decision. Although Judge Calabresi suggests that my approach "preclude[s] the agency from thinking deeply and fully about the matter," Judge Calabresi Op. at 16, I do not understand why this would be so. Unlike the majority, I do not purport to offer an authoritative constructive of 8 U.S.C. § 1101(a)(42); I would hold only that the statute is ambiguous and that the BIA's interpretation is reasonable. As Judge Calabresi elsewhere acknowledges, *id.* at 2, the BIA may always change its own interpretation of statutory law, so long as the change is not inconsistent with that law. *See, e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("For if the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." (quotation marks omitted)).

SOTOMAYOR, Circuit Judge, with whom Judge POOLER joins, concurring in the judgment:

Today's decision marks an extraordinary and unwarranted departure from our longstanding principles of deference and judicial restraint. Instead of answering the limited question before us – whether the BIA's denial of asylum to the unmarried partners of women forced to undergo abortions or sterilization was unreasonable – the majority has chosen to go far beyond it to address an issue that is unbriefed, unargued, and unnecessary to resolve this appeal. Indeed, the cases before us, which involve only *unmarried* petitioners, are inappropriate vehicles through which to opine on the merits of the BIA's position with respect to spouses under 8 U.S.C. § 1101(a)(42).[1] *See Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."); *see also Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 224 (1997) (declining to reach question which received little or no attention from the parties and noting "prudence dictates that we not decide this question based on such scant argumentation"). Moreover, as Judge Katzmann's concurrence, in which I fully join, cogently notes, today's holding simply ignores the context animating § 601's enactment and further upends

---

[1] The majority claims to be perplexed by my concern that today's decision reaches a question it need not, particularly because, the majority reasons, all judges – including myself – who agreed to hear these cases *en banc* joined an order instructing "the parties to address the BIA's interpretation of § 601 as it related to both spouses and non-married partners." Maj. Op. at 13 n.6. My concern, however, is not a quibble over the semantics of the *en banc* order, but rather the majority's unnecessary but apparently pressing need to decide a question which the facts of petitioners' appeals simply do not present. Like Judge Katzmann, I engage the question the majority answers because I would be remiss in not voicing my profound disagreement with the majority's conclusions.

congressional intent by reading the statute too narrowly. Section 601 was, after all, expressly enacted to *expand*, not contract, the availability of asylum under § 1101(a)(42) in the context of coercive population control programs.

I will not reiterate what Judge Katzmann has already ably stated. I write separately to highlight the potentially ill-considered breadth of the majority opinion, which appears to cast doubt on our own circuit's caselaw, as well as to create further circuit conflicts when such outcomes are easily avoided. Most importantly, however, I write because the majority's zeal in reaching a question not before us requires the unprecedented step of constricting the BIA's congressionally delegated powers – a decision whose ramifications we are ill-prepared, given the procedural posture of this case, to understand or appreciate fully.

The majority analyzes § 601 within the broader framework of the INA and concludes that "[n]othing in the general definition of refugee would permit 'any person' who has *not personally* experienced persecution or a well-founded fear of future persecution . . . to obtain asylum." Maj. Op. at 17. Again, I agree fully with Judge Katzmann's discussion of the fatal flaws in this analysis, and I seek only to emphasize the majority's apparent failure to appreciate that this deceptively simple proposition may unduly and inappropriately limit the BIA not merely in cases under § 601 but in others as well.

In coming to its conclusion, the majority endorses the view that "persecution" can only be direct and personal, by which it appears to mean that the granting of asylum can never be based on, in whole or in part, harm to others, no matter how closely related the harm or the person harmed is to the applicant or whether harm to another is directed in whole or in part

56

toward the applicant.[2] The majority tries to anchor this limiting principle to the text of the statute, but such a reading is unwarranted and unsupportable. It is pellucidly clear from the text of § 1101(a)(42) that Congress did not define nor intend to define "persecution" to exclude harms "not personally" suffered by an applicant. The statute instead reads that "any person" who "because of persecution or a well-founded fear of persecution" is "unable or unwilling" to return to his or her country is entitled to asylum. There is no indication whatsoever of how personal or direct the harm or injury must be, only that persecution to an individual can merit asylum protection.[3] We should, moreover, eschew the limiting construction of § 601 and § 1101(a)(42) urged in today's opinion because such a construction could lead to absurd results. *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) ("A statute should be interpreted in a way that avoids absurd results."). If government officials shot and killed an asylum applicant's child to force him or her to convert to another religion, would that harm, which the majority would ostensibly label "not personal," be insufficient in itself to demonstrate persecution of that applicant? Or what if the parent of an adult applicant was kidnapped and tortured to force the applicant to renounce an opposition political party or endorse a government candidate? In the end, I see no unambiguous language in the text of § 1101(a)(42) that compels the limiting construction of the INA that the majority now divines.

---

[2] In another portion of the majority opinion, the Court states "we conclude that the statutory scheme unambiguously dictates that applicants can become candidates for asylum relief only based on persecution that they themselves have suffered or must suffer." Maj. Op. at 19. By this pronouncement, the opinion suggests that harm to others cannot form a part of the rationale for granting asylum.

[3] I further agree with Judge Katzmann's analysis of the majority's misplaced reliance on 8 U.S.C. § 1158 to support its conclusion here.

Requiring an applicant's eligibility for asylum to rest only on instances where he or she suffers persecution "personally" merely begs the question of what personal harm is and how to define it. As with any ambiguous statutory term, it is for the BIA to determine within its expertise what exactly constitutes "persecution" so long as its interpretation is reasonable.[4] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). From its decision in *In re S-L-L-*, 24 I. & N. Dec. 1 (B.I.A. 2006), the BIA clearly construed "persecution" as not only entailing the spouse forced to undergo the procedure but also including the other spouse who, while physically unharmed, was nevertheless also targeted by the government for punishment and persecution. The BIA reached this conclusion by utilizing its traditional tests of nexus and level of harm, *id.* at 5, that is, by examining how the procedure affected each spouse's respective health and emotional well-being as well as the couple's interest in procreation and child-rearing. Perhaps most importantly of all, the BIA also considered to whom the government's actions were directed.

It is this last factor that is crucial. The majority concedes that both spouses suffer a "profound emotional loss" as a result of a forced abortion or sterilization, but it never sufficiently explains why the harm of sterilization or abortion constitutes persecution only for the person who is forced to undergo such a procedure and not for that person's spouse as well. Maj. Op. at 21. This conclusion rests on two principal conclusions, both equally flawed. First, the majority

---

[4] I note that this and other circuits have found "persecution" to be an ambiguous term in other asylum cases. *See, e.g.*, *Mirzoyan v. Gonzales*, 457 F.3d 217, 220 (2d Cir. 2006) (*per curiam*) (finding that the INA does not "unambiguously explain[] what the word 'persecution' means" in the economic context); *Corado v. Ashcroft*, 384 F.3d 945, 947 (8th Cir. 2004) (*per curiam*) ("The BIA is entitled to deference in interpreting ambiguous statutory terms such as 'persecution.'"); *cf. Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) (noting that the INA "does not define 'persecution' or specify what acts constitute persecution").

clings to the notion that the persecution suffered is physically visited upon only one spouse, but this simply ignores the question of whom exactly the government was seeking to persecute when it acted. On this point, the harm is clearly directed at the couple who dared to continue an unauthorized pregnancy in hopes of enlarging the family unit. Indeed, the majority's conclusion disregards the immutable fact that a desired pregnancy in a country with a coercive population control program necessarily requires both spouses to occur, and that the state's interference with this fundamental right "may have subtle, farreaching and devastating effects" for both husband and wife. *See Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942). The termination of a wanted pregnancy under a coercive population control program can only be devastating to any couple, akin, no doubt, to the killing of a child. Similarly, as to sterilization, the Ninth Circuit has aptly observed that:

> In addition to the physical and psychological trauma that is common to many forms of persecution, sterilization involves drastic and emotionally painful consequences that are unending: The couple is forever denied a pro-creative life together. As the BIA explained,

> > The act of forced sterilization should not be viewed as a discrete onetime act, comparable to a term in prison, or an incident of severe beating or even torture. Coerced sterilization is better viewed as a permanent and continuing act of persecution that has deprived a couple of the natural fruits of conjugal life, and the society and comfort of the child or children that might eventually have been born to them.

*Qili Qu v. Gonzales*, 399 F.3d 1195, 1202 (9th Cir. 2005) (quoting *In re Y-T-L-*, 23 I. & N. Dec. 601, 607 (B.I.A. 2003)). Viewed in this light, the harm here is directed as much at the husband as at the wife. By its action, after all, the state is preventing both members of the couple from procreating as a unit, and as the BIA found in *In re Y-T-L-*, such harm is not limited in time to

59

the moment of sterilization, but is an ongoing harm that affects a married couple indefinitely. 23 I. & N. Dec. at 607. As the Third Circuit recently observed in *Sun Wen Chen v. Attorney General of the United States*, --- F.3d ---, 2007 WL 1760658, at *5 (3d Cir. June 20, 2007), the "persecution of one spouse can be one of the most potent and cruel ways of hurting the other spouse."[5] In the end, I fail to understand how the majority can claim that the harm caused by a spouse's forced abortion or sterilization is not a personal harm to both spouses – either or both of whom can be sterilized for violations of the population control programs – especially given the unique biological nature of pregnancy and special reverence every civilization has accorded to child-rearing and parenthood in marriage. I similarly fail to understand how the majority justifies limiting the BIA's ability to take this special and egregious harm into consideration and to determine within its expertise that such acts constitute persecution against both a wife and husband.[6]

---

[5] The majority incorrectly asserts that the Third Circuit's analysis in *Sun Wen Chen* is incongruent with my own analysis because the court there held that § 601(a) contains an ambiguity. Maj. Op. at 16 n.7. The Third Circuit found that § 601(a) is ambivalent on the treatment of spouses and that the existence of derivative asylum was not "intended to foreclose *additional* pathways to asylum specific to spouses." *Sun Wen Chen*, --- F.3d ---, 2007 WL 1760658, at *4 (emphasis added); *see also id.* ("[W]e see nothing in the statute evincing Congressional intent to establish a particular policy regarding spousal eligibility."). The Third Circuit then reasoned that because § 601(a) "establishes that forced abortion and sterilization constitute persecution," *id.*, it is entirely within the BIA's authority to "interpret[] the scope of that persecution," *id.*, including its applicability to spouses. It is my contention that we should defer to the BIA's interpretation regarding the broader scope of persecution under § 1101(a)(42) and not impose, as the majority here does, an unfounded requirement that persecution be direct and personal and that harm to another, even if directed at the applicant, is never sufficient for the purposes of § 1101(a)(42). These analyses are not incongruent because they both center on the deference we owe to the BIA on defining persecution.

[6] The majority notes that its decision corrects the "perverse effect of creating incentives for husbands to leave their wives" inherent in the BIA's determination in *In re S-L-L-*, 24 I. & N. Dec. 1 (B.I.A. 2006). Maj. Op. at 27. I note first that one of the petitioners before us was not, in

Second, the majority argues that the BIA has impermissibly created an irrebuttable presumption that relieves applicants from the statutory burden of proving that they have a well-founded fear of persecution based on an impermissible nexus. As Judge Katzmann correctly observes, however, the presumption argument is merely a red herring. In enacting § 601, Congress was not creating a presumption but merely expanding the BIA's unduly restrictive definition in *Matter of Chang* of the terms "persecution" and "political opinion." Thus, § 601 defined "persecution" and "political opinion" to include an individual's forced abortion or sterilization under a restrictive population control policy. No presumption was created, however, as the applicant still bears the burden of establishing that he or she was subject to the conduct that qualifies under this expanded definition of persecution. And, while the majority places great weight on the fact that § 601 supposedly creates a presumption that "relieved only persons who actually experienced a forcible abortion or sterilization from the burden of proving a political nexus," and not those married to such persons, Maj. Op. at 21, his conclusion ignores the clear congressional intent of § 601, expressed in the legislative history, that

> [n]othing in [§ 601] is intended to lower the evidentiary burden of proof for any alien, no matter how serious the nature of the claim. The Committee emphasizes that the burden of proof remains on the applicant, as in every other case, to establish by credible evidence that he or she has been subject to persecution-in

fact, attempting to flee alone; he and his fiancée planned to leave China together but she was unfortunately caught before she could escape. More importantly, however, the majority's assertion here is based on nothing but speculation as to the decisionmaking in which couples, persecuted by coercive population control programs, must engage before attempting to flee. We simply have no foundation on which to conclude that all couples have the financial resources to escape at the same time, and as the government stated at oral argument, it is not uncommon for Chinese couples to separate and have one spouse go abroad in order to amass the necessary resources to bring over the other spouse. I believe the majority here is opining on a subject – imbued with potentially significant cultural differences – with which it has no expertise or empirical evidence.

this case, to coercive abortion or sterilization-or has a well-founded fear of such treatment.

H.R. Rep. No. 104-469(I), 1996 WL 168955, at *174 (1996). Quite simply, there is no way to read in § 601 the presumption the majority discusses, nor a limitation on the BIA in extending § 601's reach to spouses. Either the persecution occurred or it did not, and the applicant retains the burden of proving such circumstances. The BIA accordingly did not err in interpreting ambiguous terms in the INA to determine that either spouse may qualify as a refugee where one of them has in fact undergone forced abortion or sterilization.

Finally, if adopted, the majority's limiting construction may have significant, unintended consequences, broader than the Court today acknowledges. By claiming categorically that an applicant cannot rely on the harm inflicted on others in § 601 cases – no matter how closely related the harm or the person harmed is to the applicant or whether the harm is directed in whole or in part towards the applicant – to establish persecution or entitlement to asylum, this Court suggests that the BIA is precluded from *ever* considering harm to others as evidence of persecution to the applicant. While I agree that there are certainly limits as to when harm to another may inform persecution or a well-founded fear of persecution of an applicant, I cannot endorse the majority's apparent *per se* conclusion. As noted above, this is a question of statutory construction properly answered by the BIA, which, in its administrative expertise, may interpret the ambiguity inherent in "persecution" to determine when a harm is direct or personal enough to be considered persecution of an applicant. And, in certain limited contexts pertinent to this appeal, the BIA has done precisely this, examining the harm to family members in determining whether an asylum applicant has in fact suffered past persecution, particularly where an

62

immediate family member has been subjected to significant and enduring mistreatment. In *Matter of Chen*, 20 I. & N. Dec. 16, 19-21 (B.I.A. 1989), the seminal BIA decision recognizing the availability of humanitarian asylum for victims of severe past persecution, the BIA recited a litany of horrific acts visited on and suffered by Chen's parents during the Cultural Revolution, and such evidence – when coupled with the Chinese government's treatment of the petitioner himself – supported the BIA's conclusion that "the respondent has clearly established that he and his family were severely persecuted in the past in China." *Id.* at 21. Similarly, in *In re H-*, 21 I. & N. Dec. 337, 345 (B.I.A. 1996), where an applicant had testified about the severe physical beatings he had suffered as the member of a subclan in Somalia, the BIA based its finding of past persecution in part on the applicant's testimony that his father and brother, also members of the same subclan, were beaten and killed. In examining the allegations concerning the deaths of his father and brother, the BIA specifically noted that "evidence of treatment of persons similarly situated is persuasive of an applicant's claim of political persecution." *Id.* at 345 (quoting *Matter of Mogharrabi*, 19 I. & N. Dec. 439 (B.I.A. 1987)); *see also In re N-M-A-*, 22 I. & N. 312, 326 (B.I.A. 1998) (finding in the context of humanitarian asylum that the applicant had suffered past persecution in part because of "the disappearance and likely death of his father"). The BIA has thus identified specific situations in which the harm to close family members could be central to the finding of persecution and the granting of refugee status. The majority's misguided exercise in statutory interpretation, however, undermines this agency determination and suggests that because the years-long harassment and egregious mistreatment of Chen's parents or the deaths of

63

H-'s brother and father were "not personally experienced" by the applicants, neither Chen nor H- could base their asylum applications on such harm after today's decision.[7]

The holding today also calls into question our own caselaw – as well that of other circuits – in which appellate panels have recognized that harm inflicted upon one individual may give rise to, or at least help establish, persecution of another in certain circumstances. In *Jorge-Tzoc v. Gonzales*, 435 F.3d 146 (2d Cir. 2006) (*per curiam*), this Court, acknowledging that petitioner had not been "victimized directly" when as a young boy, his sister and her family were killed for their political activities, nevertheless remanded the case to the BIA for further proceedings to determine whether his age, coupled with the harm to his family members, helped to establish past persecution.[8] *Id.* at 150 (internal quotation marks omitted). While the decision rested in great part on the petitioner's age, this decision illustrates another category of asylum cases where it might be appropriate to consider harm to others in determining past persecution.[9] Similarly,

[7] The regulations governing the claims under the Convention Against Torture explicitly recognize that torture encompasses not only physical harm to the individual but also "mental pain or suffering" that results from the threat of infliction of physical pain or suffering on another person. *See* 8 C.F.R. § 1208.18(a)(4)(iv). By analogy, this regulation further supports the position that persecution is not limited to direct and physical harm upon an individual but can encompass harm inflicted on others as well. *See, e.g.*, *Yan Chen v. Gonzales*, 417 F.3d 268, 275 (2d Cir. 2005) ("Certainly . . . torture can constitute persecution . . . .").

[8] The passing statement in a footnote in *Melgar de Torres v. Reno*, 191 F.3d 307, 313 n.2 (2d Cir. 1999), that the death of the applicant's uncle did not constitute political persecution of her is not to the contrary. As noted in *Jorge-Tzoc*, the petitioner in *Melgar de Torres* "was an adult who offered no objective evidence that her uncle's killing was politically motivated." 435 F.3d at 150. To the extent that *Melgar de Torres* suggested, furthermore, that even if the petitioner had established the link between her uncle's killing and his political activities, such killing could then not be considered part of her past persecution, this suggestion was clearly *dicta*.

[9] The majority professes no opinion on the continued vitality of our holding in *Jorge-Tzoc* and claims that nothing in today's decision "preclude[s] the BIA from considering the totality of circumstances in any particular case to determine if an asylum applicant has carried his statutory

other circuits have confronted situations where they found persecution relying in whole or in part on harm to others in certain circumstances. In *Sun Wen Chen*, the Third Circuit upheld *In re S-L-L-,* the very BIA determination the majority strikes down today, in part by acknowledging that the physical harm to one's spouse is nevertheless harm to both spouses in the family planning context. --- F.3d ---, 2007 WL 1760658, at *5 ("In a great many cases, forced abortion or involuntary sterilization of one spouse will directly affect the reproductive opportunities of the other spouse . . . . And persecution of one spouse can be one of the most potent and cruel ways of hurting the other spouse . . . ."). The Sixth Circuit in *Abay v. Ashcroft*, 368 F.3d 634, 642 (6th Cir. 2004), determined that an applicant was entitled to asylum because she had fled Ethiopia with her teenage daughter to protect the teenager from undergoing forced genital mutilation. The *Abay* court specifically noted that derivative asylum under § 1158 was not available to Abay – as she was neither a spouse nor a child of a persecuted individual – but granted her asylum, observing that several oral IJ and BIA decisions "suggest a governing principle in favor of refugee status in cases where a parent and protector is faced with exposing her child to the clear risk of being subjected against her will to a practice that is a form of physical torture causing grave and permanent harm." *Id.* at 642.

Having carefully weighed the law and arguments presented in this appeal, I must concur in the judgment for the reasons already stated ably by Judge Katzmann. I agree in particular

---

burden." Maj. Op. at 26 n.13. Yet, the majority fails to explain why the totality of circumstances may not be applied in the context of married couples who suffer under coercive population control programs. If the BIA could consider the direct harm to Jorge-Tzoc's family members in determining whether Jorge-Tzoc himself had been persecuted, it should be able to consider the targeting of and effect on an individual when his or her spouse is forced to undergo an abortion or sterilization.

65

with Judge Katzmann that the Third Circuit in *Cai Luan Chen v. Ashcroft*, 381 F.3d 221 (3d Cir. 2004) (Alito, J.), did what we should have done here. In that case, then-Judge Alito found no need to reach the question of whether § 601 or § 1101(a)(42) were ambiguous because Chen, who was not married to his fiancée on whom the forced abortion was performed, could prevail only if the BIA's distinction between married and unmarried couples was unreasonable.[10] *Id.* at 227. Judge Alito ultimately ruled that the distinction was reasonable and denied the petition. *Id.* at 235. This analysis should control our own very similar cases here.[11]

Given the above, the majority should never have reached the question it has taken upon itself to resolve, particularly in the immigration context where the Supreme Court has long recognized "that judicial deference to the Executive Branch is especially appropriate . . . where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)). In reaching this question, the majority has, I fear, started a domino effect that may have significant and unforeseen repercussions. Finally, the majority, in noting that "[i]f this conclusion is inconsistent with Congress's intentions, [Congress] can, if it so chooses, of course, amend the statute," Maj. Op. at 22 n.10, seems to take comfort that its conclusion, if wrong, may

[10] While I ultimately agree with Third Circuit's recent pronouncement in *Sun Wen Chen* that the BIA properly interpreted an ambiguity in § 601 and § 1101(a)(42) to extend asylum protection to spouses of individuals forced to abort pregnancies or undergo sterilization, *Sun Wen Chen* involves a question we need not reach here because the petitioner here is not married. Had the majority dealt only with the question presented, I would adopt the approach as outlined by then-Judge Alito in *Cai Luan Chen*.

[11] Unlike my esteemed colleague Judge Calabresi, I do not find that the BIA limited its analysis to § 601 in *In re S-L-L-*, but rather was grounding its interpretation in both the specific language of § 601 and the more general definition of "refugee" in § 1101(a)(42). Because the statute is ambiguous, I would defer to the BIA's interpretation here.

66

be simply overturned.  But for those petitioners who fled a draconian population control program because their spouses had been forced to undergo an abortion or sterilization, the majority's caveat must be cold comfort indeed.

CALABRESI, *Circuit Judge*, concurring in part and dissenting in part:

What is remarkable about this case is that essentially everyone on this court agrees that IIRIRA § 601(a), *codified at* 8 U.S.C. § 1101(a)(42)(B), cannot be read to grant *per se* asylum to spouses. This is remarkable because it is in direct conflict with every other circuit, the BIA, and ten years of rulings. *See* Maj. Op. at 5 & n.4. Yet we all agree. And we are correct. Moreover, it follows that, because § 601(a) does not grant that kind of asylum to spouses, it also cannot be read as granting asylum to non-spouses — like the petitioners in this case. This part of the majority's analysis is admirable, and I join it.

Because § 601(a), in unambiguous terms, grants *per se* "refugee" status only to the "person who has been forced to abort a pregnancy or to undergo involuntary sterilization," the panel in this case — consisting of the author of the majority opinion, the principal concurrence, and me — sent the case back to the BIA, to allow the agency to reexamine its decision in *In re C-Y-Z- (C-Y-Z-)*, 21 I. & N. Dec. 915 (B.I.A. 1997) (en banc) (construing § 601 as granting *per se* "refugee" status to spouses). The BIA stuck to its decision, *see In re S-L-L- (S-L-L-)*, 24 I. & N. Dec. 1 (B.I.A. 2006) (en banc), but has not convinced us that *C-Y-Z-*'s rule can be squared with the plain text of § 601(a), and so we now appropriately say that the BIA was wrong.

Unfortunately, both the majority and concurrences are not willing to stop with that, which was the issue clearly before us and fully considered by the BIA. For reasons that are quite understandable, but nonetheless wrong — both in terms of results and in terms of what the Supreme Court has said about our relationship to the BIA — the majority and the concurrences

68

go further. They do so in different directions, and that fact is, to me, simply additional evidence that going further was inappropriate.

## I

The majority says that if the BIA were to construe the general definition of "refugee" found in 8 U.S.C. § 1101(a)(42)(A) as granting *per se* refugee status to certain categories of people — e.g., spouses or non-spouses — that would be an impermissible reading of § 1101(a)(42)(A). This seems to me to be mistaken on several counts.

## A

First, the majority relies on the fact that § 601(a) was enacted to overturn *Matter of Chang*, 20 I. & N. Dec. 38, 44 (B.I.A. 1989) (adopting the rule that victims of a coercive family planning regime could claim refugee status only if the victims demonstrated that the family-planning policy had been "selectively applied" to them on the basis of a protected ground). *See* Maj. Op. at 17. The majority posits that § 601(a) was not intended to do more than overturn *Chang*, and that *Chang* is therefore left in place as to spouses and partners who are not themselves forcibly aborted or involuntarily sterilized. *See* Maj. Op. at 18 ("The inclusion of some obviously results in the exclusion of others."). And, under *Chang*, spouses and partners are not entitled to *per se* refugee status.

Fair enough, but *Chang* is not an opinion of the Supreme Court, or even of a Court of Appeals; it is an interpretation of underlying statutory law *by the BIA*. As such, the agency is perfectly free to change it — so long as the change is not inconsistent with the underlying law.

69

Thus, any suggestion that the BIA could not, because of *Chang*, now grant *per se* status to spouses pursuant to § 1101(a)(42)(A) is a *non sequitur*, plain and simple.

**B**

Second, the logical consequences of what the majority seems to be saying appear to me to be untenable. Suppose the BIA were to issue an interpretation of § 1101(a)(42)(A) that said, categorically, that any child who sees his parents tortured and murdered before him by a totalitarian government — say, the Nazis — is persecuted, and therefore eligible for asylum. Would such a ruling be invalid under § 1101(a)(42)(A)'s broad definition of refugee? If that is what the majority is saying, it is, in my judgment, manifestly absurd. There is nothing in the language or history of § 1101(a)(42)(A) that suggests the BIA could not adopt such a *per se* rule.

But, if the BIA *could* adopt the kind of *per se* rule I described above — and I believe a majority of our court would agree with me that such a rule would indeed be proper — then it is improperly premature to say — as today's governing opinion does — that the agency could not adopt an analogous *per se* rule with respect to individuals in the situation of the petitioners in this case. It may be that if the BIA did adopt such a *per se* rule, I would ultimately agree with the majority that, in the context of coercive family planning laws, such an interpretation of § 1101(a)(42)(A) is "unreasonable" at *Chevron*'s Step Two.[1] But once it is admitted that *some* categorical *per se* asylum rules — like the one involving my hypothetical children — might be valid under § 1101(a)(42)(A) (i.e., would get by *Chevron* Step One) — it is, I believe, impermissible to say that an equivalent *per se* interpretation dealing with spouses *would necessarily* be invalid if it *were* adopted — which is in effect what the majority's holding

---

[1] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

70

amounts to.  It is impermissible given the Supreme Court's unanimous decisions in *INS v. Orlando Ventura*, 537 U.S. 12 (2002) (per curiam), and *Gonzales v. Thomas*, 547 U.S. 183, 126 S. Ct. 1613 (2006) (per curiam).

**1**

In *Ventura*, the Supreme Court held that, "[g]enerally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."  537 U.S. at 16.  "This principle," the Court explained, "has obvious importance in the immigration context," *id.* at 16-17, because "[w]ithin broad limits the law entrusts the agency to make the basic asylum eligibility decision here in question."  *Id.* at 16.  Subsequent case law has only strengthened *Ventura*'s reasoning.  The "ordinary remand rule" was recently reaffirmed by a unanimous Supreme Court in *Thomas*, 126 S. Ct. 1613, and has been followed by our court in a series of cases, most notably in *Ucelo-Gomez v. Gonzales*, 464 F.3d 163, 168-70 (2d Cir. 2006).  Yet, despite the "obvious importance" of the ordinary remand rule in the immigration context, the majority insists on precluding the BIA from interpreting § 1101(a)(42)(A)'s general provisions in the first instance.  In my view, this aspect of the majority's holding is dangerously in tension with *Ventura*'s command.

In *Ventura* — much as in the case before us — the Ninth Circuit reversed a holding of the BIA, and then "went on to consider an alternative argument that the Government had made before the Immigration Judge," but which "the BIA itself had not considered . . . ."  537 U.S. at 13.  Specifically, the Ninth Circuit reversed the BIA's holding that the petitioner was not persecuted "on account of" a "political opinion," but then, rather than remanding to the BIA for

71

further proceedings, the court evaluated for itself, and rejected, the government's alternative argument that the petitioner failed to qualify for asylum because of changed country conditions in Guatemala. *Id.* In reversing the Ninth Circuit's judgment, the Supreme Court found that the court of appeals

> seriously disregarded the agency's legally-mandated role. Instead, it independently created potentially far-reaching legal precedent about . . . a highly complex and sensitive matter. And it did so without giving the BIA the opportunity to address the matter in the first instance in light of its own expertise.

*Id.* at 17.

More recently, the Court in *Thomas* reversed a Ninth Circuit decision which had decided, without first remanding the issue to the BIA, "that in principle 'a family *may* constitute a social group for the purposes of the refugee statutes,' . . . [and] that the particular family at issue . . . fell within the scope of the statutory term 'particular social group.'" 126 S. Ct. at 1614 (quoting *Thomas v. Gonzales*, 409 F.3d 1177, 1187, 1189 (9th Cir. 2005) (en banc)) (emphasis added). Quoting *Ventura* — and echoing the basic principle of *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80 (1943), that "an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency," *id.* at 88 — the *Thomas* Court reiterated that "[a] court of appeals is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Thomas*, 126 S. Ct. at 1615 (quoting *Ventura*, 537 U.S. at 16 (internal quotation marks omitted)).

72

In *Ucelo-Gomez*, a panel of this court concluded that *Thomas* and *Ventura* establish the rule that "where (as here) the agency has yet to decide whether a group, a thing, or a situation falls within the ambit of a statutory term, the proper course is for the reviewing court to remand the matter to the agency in accordance with the well-worn ordinary remand rule." *Ucelo-Gomez*, 464 F.3d at 169 (internal quotation marks omitted). Moreover, the panel in *Ucelo-Gomez* asserted that "the agency interpretation required by *Thomas* and *Ventura* is 'in the first instance' a particularized interpretation by the agency." *Id.* (emphasis omitted).

As a purely formal matter, the approach taken by the majority today is perhaps reconcilable with *Ventura* and *Thomas*. But it is fundamentally incompatible with the spirit of those cases. Even if the majority is convinced that *C-Y-Z-*'s rule would be an unreasonable construction of § 1101(a)(42)(A), the correct approach would be to allow the agency to make a determination on that matter first. Instead, the majority opinion — perhaps realizing that it could not, at this time, authoritatively speak on the question of *C-Y-Z-*'s reasonableness *as a construction of § 1101(a)(42)(A)* — by a preemptive strike strips the BIA of its capacity to consider the issue under § 1101(a)(42)(A). In so doing, the majority precludes the BIA from examining thoroughly this "highly complex and sensitive matter," *Ventura*, 537 U.S. at 17, and "independently create[s] . . . far-reaching legal precedent . . . . without giving the BIA the opportunity to address the matter in the first instance in light of its own expertise." *Id.* Significantly, *Ventura* and *Thomas* are designed to prevent just such judicial preemption of BIA positions, even when that preemption reaches what is arguably the correct result.

2

Moreover, even if the majority were not *required* — as I believe it was — to remand Zhen Hua Dong's case to the BIA,[2] it should have remanded his case as a matter of wise discretion. *Cf. Jian Hui Shao v. Bd. of Immigration Appeals*, 465 F.3d 497, 501, 503 (2d Cir. 2006) (concluding that "the BIA is better situated than we are to decide the *statutory interpretation* question in the first instance," and noting that "[o]ur decision to remand this *question of law* to the BIA for resolution in the first instance is supported by recent decisions of the Supreme Court of the United States and our Court" (emphases added)); *Yuanliang Liu v. U.S. Dep't of Justice*, 455 F.3d 106, 116 (2d Cir. 2006) ("Because we conclude, as a matter of *discretion*, that it is prudent and useful for us to remand the issue of frviolousness, we need not address the more complicated question of when remands to the BIA are *required* by elementary principles of administrative law.").

---

[2] The question of whether, as a matter of *Chevron* Step Two "reasonableness" review, the BIA could base its *C-Y-Z-* decision on § 1101(a)(42)(A), is arguably neither a pure question of fact, nor of statutory interpretation. And the extent to which such mixed questions may be resolved by a Court of Appeals, without first remanding to the agency for its consideration, has not been clearly settled by the Supreme Court. *Compare Thomas*, 126 S. Ct. at 1615 ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (quoting *Ventura*, 537 U.S. at 16) (internal quotation marks omitted)) *with id.* (requiring remand, and observing that "[t]he matter requires determining the facts and deciding whether the facts as found fall within a statutory term"); *Hussain v. Gonzales*, 477 F.3d 153, 157-58 (4th Cir. 2007) (distinguishing between factual issues not considered by the BIA, and statutory issues, and reasoning that *Ventura* and *Thomas* were directed only toward *factual* issues); *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1132-35 (9th Cir. 2006) (considering a variety of factors — including the fact that the issue being decided would, following a remand to the BIA, have been reviewed by the court *de novo* anyway — in concluding that the *Thomas-Ventura* remand rule did not apply to the particular issue in question); *Ucelo-Gomez*, 464 F.3d at 170 ("[I]f a reviewing court can state with assured confidence (absent agency guidance as to its protectability under the INA) that a group would or would not under any reasonable scenario qualify as a 'particular social group,' it need not remand, and may rule on the issue in the first instance.").

74

I believe that the majority's haste in narrowly construing § 1101(a)(42)(A) — and, therefore, in cabining the BIA's discretion — is particularly troubling given the circumstances of this case. At stake is a rule of the BIA that has been in place, and relied upon, for over ten years. *See S-L-L-*, 24 I. & N. Dec. at 14 (Board Member Pauley, concurring) ("[N]otwithstanding my belief that *Matter of C-Y-Z-* . . . was wrongly decided, I would not overrule it now, nearly a decade later and in the aftermath of thousands of decisions applying it to grant asylum on a derivative basis."). In addition, the invalidation of *C-Y-Z-*'s rule will have sweeping ramifications for this court's immigration law docket; by one estimate, "70-80 percent of the [petitioners in our court] are Chinese seeking asylum to escape their homeland's family planning policies." *BIA Appeals Remain High in 2nd and 9th Circuits*, The Third Branch: Newsletter of the Fed. Cts. (Admin. Office of the U.S. Cts. Office of Pub. Affairs, D.C.), Feb. 2005, *available at* http://www.uscourts.gov/ttb/feb05ttb/bia/index.html (citing statement of Elizabeth Cronin). Given all this, our court should have approached the question of *C-Y-Z-*'s permissibility — either as it was or with nuanced modifications — not with haste, but with trepidation. For the truth is that we cannot foretell how the BIA would have interpreted the general definition of § 1101(a)(42)(A), had it been asked to focus on that language.

By trying to decide something that is not yet before us, the majority bars the BIA from bringing its expertise to bear on this sensitive issue. In the process, the majority does not only preclude the BIA from reenacting the *per se* rule of *C-Y-Z-* — a rule which, at the proper time, I might well have concluded was "unreasonable" at *Chevron* Step Two, for all of the reasons the majority recites. The majority also prevents the agency from interpreting the general language

of § 1101(a)(42)(A) in ways which might have suffered from none of the problems the majority

properly associates with the current *per se* rule — ways, incidentally, which might truly have

promoted congressional policy goals.[3]  In this respect, the majority opinion keeps the agency

from doing what administrative agencies do best, namely, using their expertise to convert

general statutes into specific rules that best reflect an underlying legislative intent.[4]

* * * *

---

[3] To cite just one of the many possibilities which the majority prematurely forecloses: had the BIA not relied on § 601(a)'s automatic persecution rule, but instead focused on the general notion of "persecution," the agency might have interpreted § 1101(a)(42)(A) as providing (1) that partners who had tried to marry, and were prevented from doing so, but who stayed together, are jointly eligible for asylum (which conclusion would both (a) promote the congressional policy of keeping families together, and (b) extend asylum eligibility to individuals not already covered by § 601(a)); but (2) that husbands who are legally married at the time of a wife's forced abortion, but who choose to leave their wives behind for good, are not.

[4] I am mindful that the Supreme Court has cautioned that respect for the role and expertise of agencies does not "require that we convert judicial review of agency action into a ping-pong game," and that, therefore, remand is not required when it "would be an idle and useless formality."  *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969); *see also Li Zu Guan v. INS*, 453 F.3d 129, 135-38 (2d Cir. 2006) (discussing futility standards); *Alam v. Gonzales*, 438 F.3d 184, 187-88 (2d Cir. 2006) (per curiam) (same).  Moreover, and relatedly, the Supreme Court has clarified that a reviewing court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (same).

But, regardless of whether these cases, which limit the necessity to remand, are understood to be "exceptions" to the *Chenery* and *Ventura-Thomas* requirements, or merely a reflection of the deeper truth that formulaic statements cannot substitute for sound judgment in particular cases, *see Li Hua Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 112 (2d Cir. 2006), it remains clear on which side of the line the case before us falls.  We simply do not know — and, because the majority and concurring opinions make it almost impossible for the BIA to consider the general language of § 1101(a)(42)(A) in the first instance, in relation to spouses and partners of directly victimized persons, we are not likely to learn — how the BIA would have interpreted § 1101(a)(42)(A) had it been asked to do so.  This is not a case in which the agency's path, while not perfectly clear, can "reasonably be discerned"; nor is it a case in which the agency's likely response to a remand can be predicted with confidence.  Rather, it is a case in which (1) the BIA has not yet spoken — at all, and certainly not clearly — on § 1101(a)(42)(A)'s breadth in this area, and (2) our court has, unfortunately, chosen to make further inquiry impossible.

Ironically, it was precisely because of the above reasons that the panel in *Shi Liang Lin* — comprised, as I mentioned earlier, of the author of the majority opinion, the principal concurrence, and me — sent it back originally. Yet if the majority's reasoning were valid, then there would have been no reason for the panel to do so. Nonetheless, we sent it back then, and the BIA ruled only as to whether *per se* refugee status could be granted directly under § 601. *See infra* Part II.B. If the case were sent back again, to allow the agency to consider whether to extend *per se* protection under § 1101(a)(42)(A), it is possible that the BIA would have agreed with the majority that no such protection should be adopted. Or the BIA might have adopted a more sensible rule. Under the majority's approach, we will never know.

Accordingly, I respectfully, partially, dissent from the majority opinion.

## II

But I cannot join the concurrences either. They act as if the BIA, because it mentioned "nexus" in passing, *made a ruling* under § 1101(a)(42)(A). It didn't. Since the agency has yet to interpret the broad language of that section, it is wrong for us to say — as the concurrers do — that the agency expressed views to which we owe deference. And this is so, regardless of whether such a ruling, had it been made, would have passed the requirements of *Chevron* Step Two.

## A

In *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80 (1943), and *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194 (1947), the Supreme Court articulated, and then reaffirmed, "a simple but fundamental rule of administrative law": "[A] reviewing court, in dealing with a

determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Chenery II*, 332 U.S. at 196. And "[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.* The reason for this rule is obvious: "If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment," because "an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Chenery I*, 318 U.S. at 88.

The *Chenery* decisions also recognized "an important corollary of the foregoing rule": "If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable." *Chenery II*, 332 U.S. at 196. As the Court explained, "[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *Id.* at 196-97. If it were otherwise, an appellate court could impose its own policy judgments under the guise of "review."

Our court has repeatedly recognized and applied these fundamental rules of administrative law: (1) we may only review that which an agency itself has stated; and (2) the agency must make those statements in clear terms. *See, e.g.*, *Riverkeeper, Inc. v. EPA*, 475 F.3d 83, 105 (2d Cir. 2007) ("We cannot opine on this subject, because we must consider only those justifications that the [agency] offered at the time of the rulemaking."); *Singh v. U.S. Dep't of*

*Justice*, 461 F.3d 290, 294 n.3 (2d Cir. 2006) ("[W]e cannot, on appeal, substitute an argument — even one the BIA made in another context — for those that the BIA actually gave to support the conclusion . . . dispute[d] on appeal."); *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 400 (2d Cir. 2005) ("[W]e will limit our review of the [agency's] decision to the reasons [it] actually articulates . . . . To assume a hypothetical basis for the [agency's] determination, even one based in the record, would usurp [the agency's] role."); *Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 192 (2d Cir. 2005) ("The government suggests that we may simply supply our own rationale for the BIA's decision in *C-Y-Z-* and then act accordingly. But the Supreme Court has made clear that '[i]t will not do for a court to be compelled to guess at the theory underlying [a particular] agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.' It is not difficult to understand why. Were courts obliged to create and assess ex-post justifications for inadequately reasoned agency decisions, courts would, in effect, be conscripted into making policy." (quoting *Chenery II*, 332 U.S. at 196-97)).

## B

I recite these well-known tenets of administrative law because I believe that they preclude us from taking the route advocated by the concurring opinions. Because the BIA's opinion in *S-L-L-* is lacking in clarity, it is certainly *possible*, with some creativity, to construe the decision as having been based on rationales which the BIA itself did not invoke. But we are not empowered to invoke those reasons. The BIA is required to speak for itself.

### 1

The precise basis of the BIA's decision in *C-Y-Z-* was anything but clear. But the BIA

and this court have in the past stated that it was based on a construction of § 601(a). *See Shi*

*Liang Lin*, 416 F.3d at 188 (noting that, in *C-Y-Z-*, "the BIA held that, *under IIRIRA § 601(a)*,

the forced sterilization or abortion of one spouse is an act of persecution against the other spouse

. . . ." (emphasis added)); *see also id.* at 191 ("[A] fresh look at *C-Y-Z-* reveals that the BIA

never adequately explained how or why, in the first instance, *it construed IIRIRA § 601(a)* to

permit spouses of those directly victimized by coercive family planning policies to become

eligible for asylum themselves." (emphasis added)); *see S-L-L-*, 24 I. & N. Dec. at 3 ("In *Matter*

*of C-Y-Z-*, *supra*, we held that a husband whose wife was forcibly sterilized could establish past

persecution *under this amendment* [i.e., IIRIRA § 601(a)]" (emphasis added)).

In *Shi Liang Lin*, the panel

> remand[ed] the instant petitions to the BIA so that the BIA [could]: (a) more
> precisely explain its rationale for *construing IIRIRA § 601(a)* to provide that the
> 'forced sterilization of one spouse on account of a ground protected under the Act
> is an act of persecution against the other spouse' and that, as a result, the spouses
> of those directly victimized by coercive family planning policies are *per se* as
> eligible for asylum as those directly victimized themselves; and (b) clarify
> whether, when, and why boyfriends and fiancés may or may not similarly qualify
> as refugees *pursuant to IIRIRA § 601(a)*.

*Shi Liang Lin*, 416 F.3d at 192 (emphases added).

Thus, in remanding, the *Shi Liang Lin* panel plainly assumed that the BIA's ruling

in *C-Y-Z-* was based on a construction of § 601(a), and accordingly, requested that the BIA

explain how § 601(a) might plausibly be read in such a manner. Consistent with these

instructions, the BIA's response in *S-L-L-* focused on the scope of § 601(a). *See S-L-L-*, 24 I. &

N. Dec. at 1 ("The United States Court of Appeals for the Second Circuit has remanded this case

80

with a request that we further explain our rationale in *Matter of C-Y-Z-*, 'for construing IIRIRA § 601(a) to provide that the "forced sterilization of one spouse on account of a ground protected under the Act is an act of persecution against the other spouse" . . . .'" (internal citation omitted)); *id.* at 4 ("[W]e reaffirm our holding in *Matter of C-Y-Z-* . . . .").

Perhaps sensing that § 601(a)'s text had little to offer, however, the BIA's decision in *S-L-L-* provided little analysis of that text. Instead, the BIA asserted, conclusorily, that its decision in *C-Y-Z-* "reflects the significant tensions inherent in the IIRIRA amendment"[5] and that "[t]here is no clear or obvious answer to the scope of the protections afforded by the amendment to partners of persons forced to submit to an abortion or sterilization." *S-L-L-*, 24 I. & N. Dec. at 4. The BIA did not hint at what these "tensions" might plausibly be, or why the plain language of § 601(a) should not be taken as establishing the proper scope of "the IIRIRA amendment." Instead, the BIA "reaffirm[ed] [its] holding in *Matter of C-Y-Z-*," *id.*, largely on the basis of stare decisis and Congress's supposed acquiescence.

It is the BIA's reticence to engage with § 601(a)'s text — and the resulting ambiguity in the BIA's opinion in *S-L-L-* — that the concurring opinions now seek to convert into an argument that *S-L-L-* was based, not on § 601(a), but on the general definition of "refugee" found in § 1101(a)(42)(A). It is true that, at one point in *S-L-L-*, the BIA obscurely remarked that "[a]lthough there is no specific reference in the statutory definition of a refugee to a husband's claim based on harm inflicted upon his wife, the general principles regarding nexus and level of harm apply in determining such a claim." *S-L-L-*, 24 I. & N. Dec. at 5.

---

[5] The "IIRIRA amendment" refers, of course, to § 601(a).

But this phrase cannot, I believe, establish — as the concurring opinions would have it — that the BIA's decision in *S-L-L-* was based on the general terms "persecution" and "political opinion" found in § 1101(a)(42)(A). And, even if it did, it would not do so clearly (as required by *Chenery II*). Indeed, one can say, as to that: manifestly not.

Notably, in its very next breath, after using the nexus phrase relied on by the concurrers, the BIA in *S-L-L-* stated that it was applying "general principles requiring nexus and level of harm for past persecution in assessing *a claim under the IIRIRA amendment*." *Id.* (emphasis added). It is permissible to read § 601(a) in this way, the BIA argued, because "[a]lthough the wife is obviously the individual subjected to the abortion procedure, Congress was concerned not only with the offensive assault upon the woman, but also with the obtrusive government interference into a married couple's decisions regarding children and family." *Id.* at 6. Therefore, the BIA concludes, "[w]hen the government intervenes in the private affairs of a married couple to force an abortion or sterilization, it persecutes the married couple *as an entity*." *Id.* (emphasis added). It seems to me patent that the BIA reached this conclusion under § 601(a), and not § 1101(a)(42)(A).

**2**

In my view, then, the BIA's decisions in *C-Y-Z-* and *S-L-L-* were grounded in a (mistaken) belief that, based on an "entity theory" of persecution, spouses of those directly victimized by coercive family planning policies could themselves become directly eligible for asylum under § 601(a). And it is not enough for the concurring opinions to cast doubt on my conclusion; *Chenery II*'s "clarity corollary" requires that the agency make clear its decision to

82

rest upon a purported ground.  Thus, to restate my problem with the concurring opinions: They would use the fact that the BIA refused to engage clearly with the text of § 601(a) as a basis for concluding that the BIA was relying on something else.  But the incompatibility of this approach with *Chenery II* is apparent.

Moreover, the (at best) ambiguousness of the BIA's decision in *S-L-L-* results in precisely the problems adverted to in *Chenery II*.  For it is far from clear that, had the BIA focused on the general definition of § 1101(a)(42)(A), the agency would have preserved *C-Y-Z-*'s rule in its current form.  That is, had the BIA been asked to examine, not § 601(a)'s automatic-eligibility rule, but instead the more general definition of "refugee," it is quite possible that the BIA would have come up with a different *per se* rule, and perhaps even one that would have avoided the many problems inherent in its *C-Y-Z-* approach.  *See supra* at 8-9.

Under the concurring opinions's approach, we are unlikely to know.  For, by reading the agency's opinion as deciding that which it did not decide — and certainly did not decide clearly — the concurring opinions, in effect, preclude the agency from thinking deeply and fully about the matter.  And that is the very thing which the clarity requirement of *Chenery II* is meant to make the agency do.

### III

In the end, as at the beginning, the BIA read us to ask — what we in fact asked: whether *C-Y-Z-*'s rule could be based upon § 601(a)'s text, and if so, what its reasons were.  The agency could, under our remand, have turned more broadly to § 1101(a)(42)(A).  It didn't, and it certainly didn't do so clearly.  Today, we properly reject the BIA's ruling interpreting the

coverage of § 601(a). But in the spirit of *Ventura*, *Thomas*, and our own tradition of sending

things back to the BIA for a first reading, we should now ask the BIA something that it has never

been asked by any court: *What would you do under § 1101(a)(42)(A), given that § 601(a) does*

*not give you the authority to do what you did in C-Y-Z- and S-L-L-?*[6]

We do not know what answer the BIA would give to that question for the simplest

of reasons. The agency has never been specifically asked. And we should not, indeed *cannot*

properly, assume that what it *would* say in response — one way or another — would be either a

reasonable or an unreasonable interpretation of the statute. Moreover, since it is possible that

such interpretation might have covered Zhen Hua Dong, I cannot concur with the majority and

concurrences that his case is now hopeless.

The sad thing is that, in their rush to reach a result in terms of who gets asylum

and who does not, both the majority and the concurrers sanction bad law and bad practices with

---

[6] The majority, attempting to answer my opinion, says, at footnote 15, that remanding Zhen Hua Dong's case to the BIA would be engaging in useless "ping pong." With great respect, the majority in that footnote simply repeats its conflation of two quite separate things. It is certainly true that the BIA has had multiple occasions to consider the "spousal" question under § 601(a), and has answered (incorrectly, we all agree) that *per se* persecutee status is available to spouses under that section. But it has never been asked what the status of spouses or of people situated like Zhen Hua Dong would be under the general terms of § 1101(a)(42)(A), if § 601(a) did not cover spouses. And, in view of its consistent – but incorrect, we today hold – rulings that § 601(a) did apply to spouses, the BIA never had any reason to address that question on its own. The concurrers, nevertheless, act as if the BIA had addressed the question and had validly given spouses *per se* persecutee status under § 1101(a)(42)(A). The majority holds that *even if* the BIA were to consider the question, it could not validly say that spouses et al. were covered *per se*. Both the majority and the concurrers seem to me to overstep, and for precisely the reasons indicated in *Ventura* and *Thomas*. It is not proper for appellate courts to speak for the BIA and to decide the validity of that "speech," before the agency has had a full and focused opportunity to make its position clear. On § 1101(a)(42)(A), the agency has not yet had that opportunity. It is not ping pong when only one player has been invited to the relevant table.

respect to our relationship with the BIA.  The reason they do this is certainly understandable. But it is all unnecessary.  It's just being in a hurry.

* * * *

For all these reasons, while I concur with the majority opinion insofar as it (1) dismisses the petition of Xian Zou for lack of jurisdiction; (2) denies the petition of Shi Liang Lin as moot; and (3) persuasively interprets 8 U.S.C. § 1158(c)(2)(A) as being limited to a "fundamental change" in *country* conditions, I must respectfully dissent from the premature denial of Zhen Hua Dong's petition.